# Wytheville.

## HOUSTON'S ADM'X V. SEABOARD AIR LINE RAILWAY.

### June 18, 1918.

1. RAILROADS—*Master and Servant—Rules—Construction.*—A railroad company had printed rules for the guidance of its employees, among them the following: "Engines will have steam blowed off and blowers provided when possible to do so before a boiler-maker will be required to work in a fire-box. Tanks will be cleaned out before boiler-makers will be required to work inside of them."

   *Held:* That the rule had no application to oil tank cars. The context of the rule would seem to indicate that the rule was restricted to the engine tender tanks of locomotives, and that it was so restricted was stated to have been well understood by the employees of the company, which statement was not denied by any evidence in the instant case.

2. MASTER AND SERVANT—*Safe Place to Work.*—The rule that it is the duty of the master to use ordinary care to provide a reasonably safe place in which the servant is to work does not generally apply where the servant is sent to make repairs in order to render the place safe.

3. MASTER AND SERVANT—*Negligence of Master—Case at Bar.*—In the instant case the foreman of defendant went with plaintiff's intestate, an experienced boiler-maker, to a car, described in the evidence as a Texas oil tank car, and pointed out to him the tank and instructed him to rivet a grab-iron on the end of the tank. Intestate well knew that the work to be done by him could only be done by going, orvsending his helper, into the tank. Lying alongside of the tank was a line of hose charged with compressed air and connected with a compressed air machine, and readily available to blow out the tank, if necessary. Intestate, however, did not blow out the tank. The company knew nothing of the contents of the tank.

   *Held:* That defendant company was not guilty of actionable negligence, where intestate was killed by an explosion of gas in the tank caused by the dropping of a heated rivet into the tank, as requested by him. It was not the duty of the company, under the circumstances, to send another employee to blow out the tank, which the intestate could do as well as any other.

4. MASTER AND SERVANT—*Assumption of Risk—Contributory Negligence.*—Assumption of risk is a matter of contract, while contributory negligence is a matter of conduct. This distinction, however, has not always been observed in the application of the law to the facts of particular cases.

5. MASTER AND SERVANT—*Assumption of Risk.*—By the contract of service, the servant impliedly assumes the risk of all dangers that are naturally and normally incident to that service, and not due to the master's negligence. The servant also assumes, by his contract of service, the dangers thereafter arising in the course of his employment which become known to him, or which by the exercise of ordinary care on his part ought to become known to him including, of course, all open and obvious dangers.

6. MASTER AND SERVANT—*Assumption of Risk.*—As to dangers arising after entering into the contract of service, it is the duty of the servant to bring them to the attention of the master and ask their removal, and if the master refuses to remove them, the servant should quit the service; but if he fails to notify the master, and continues in the service when he knows or ought to know of the danger, he thereby assumes the risk. It is a part of his contract of service that he will thus assume such risks. He impliedly agrees at the time of entering into the contract of service that, as to such dangers, he will either report them and have them remedied, or else will assume the risk of them, if he continues in the service. As to this class of dangers, the rule is the same whether the master be guilty of negligence or not.

7. MASTER AND SERVANT—*Assumption of Risk.*—In order to charge the servant, however, with the assumption of the risk of dangers, they must be so patent as to be instantly recognized by persons familiar with the business and accustomed to the service. The particular injury sustained need not have been apprehended nor the danger thereof fully realized, but the servant must know and appreciate the fact that the service in which he is about to engage involves the risk of danger to him, or be chargeable with such knowledge, before he can be held to have assumed it.

8. MASTER AND SERVANT—*Assumption of Risk—Knowledge of Servant.*—If the servant has full knowledge of all the physical conditions, he is chargeable with knowledge of all the resulting dangers proximately resulting therefrom which would be obvious to a man of ordinary care and prudence. He need not have had in mind at the time he assumed the risk the particular danger which subsequently resulted in his injury.

9. MASTER AND SERVANT—*Assumption of Risk—Knowledge of Ser-*

*vant.*—The general rule is well settled that where the master and servant are possessed of equal knowledge, or means of knowledge, of defects or dangers, or where they are equally ignorant thereof, the servant assumes the risk; and the same is true *a fortiori* where the servant has better means of knowledge than the master. But if the master knows, or is under an obligation to know, of dangers of which the servant is ignorant, and of which he is not under an equal obligation to know, there is no assumption of risk.

10. MASTER AND SERVANT—*Assumption of Risk—Case at Bar.*— Plaintiff's intestate, an experienced boiler-maker, was directed to make repairs in an oil tank car. He found the tank car closed when he came to do his work. He knew that it had not been ventilated, but took no steps to ventilate it, though the facilities therefor were readily at hand. He also knew from the experience of others that it was not safe to enter it. At least two persons reported a very strong and pungent odor in the car, and while he did not know what had been transported in the car, yet the character of the car itself was an advertisement to him of what had probably been transported in it— that is, either oil, gasoline or something of that kind. He was chargeable with notice of the fact, which is common knowledge, that if oil is left in a car of this kind, tightly closed, gases are likely to arise, and that such gases are inflammable. His own senses must have informed him of the presence of gas in the car, and while the witnesses testified that they did not know the nature of the gases, or that they were inflammable, still he was chargeable with knowledge of facts sufficient to show that it was dangerous to bring fire into contact with the contents of the car. This danger was patent, open and obvious, and when he directed a red hot rivet to be dropped into the tank, he assumed the risk of the consequences.

Error to a judgment of the Circuit Court of Norfolk county, in an action of trespass on the case. Judgment for defendant. Plaintiff assigns error.

*Affirmed.*

The opinion states the case.

*Hicks, Morris, Garnett & Tunstall,* for the plaintiff in error.

*Goodrich Hatton,* for the defendant in error.

BURKS, J., delivered the opinion of the court.

This is an action under the federal employers' liability act (act April 22, 1908, chapter 149, 35 Stat. 65 [U. S. Comp. St. 1916, sections 8657-8665]) to recover for the death of the plaintiff's intestate caused by the alleged negligence of the defendant. The negligence charged was the failure of the defendant to use ordinary care to provide a reasonably safe place in which the plaintiff's intestate was to work. There have been three trials of the case. On the first trial, there was a verdict for the plaintiff for $5,000, which the trial court set aside because it had admitted immaterial evidence, and further because the plaintiff's intestate assumed the risk of the injury from which he died. At the second trial, there was a judgment for the plaintiff for $6,000 which the trial court also set aside on the ground that the plaintiff's intestate assumed the risk of the injury from which he died. On the third trial the defendant demurred to the evidence and the jury rendered a verdict for the plaintiff for $7,500, subject to the opinion of the court on the demurrer to the evidence. The trial court sustained the demurrer, and to its judgment this writ of error was awarded.

The evidence on the first and second trials is not certified, so that it does not appear whether or not the evidence on the last trial was substantially the same as that on either of the other trials.

The facts in the last trial, viewed from the standpoint of the demurrer to the evidence, are substantially as follows: There was placed on the repair tracks of the defendant on March 23, 1914, a Texas oil tank car. Among other repairs required to be made to the car, it was necessary to rivet a grab-iron on the end of the tank. Work of this kind

was seldom required; this car being the second of the kind needing repairs in a period of twelve or fourteen years. On the morning of March 24, 1914, the foreman of boiler-makers of the company directed John T. Houston, an experienced boiler-maker, who had been in its employment intermittently for a period of fourteen years, to rivet the grab-iron on the car. Houston, with his helper, a boy sixteen years of age, proceeded to the car, which, as stated, was on one of the repair tracks. He found two other workmen of the defendant present making other repairs on the car. The tank was mounted on trucks, was thirty feet long, seven feet in diameter, and circular in shape. In the center of the tank and on top of it there was a dome projecting up twenty-eight inches, and at the top of this dome was a manhole twenty-two inches in diameter. The tank was loaded through this manhole and no light could penetrate the tank, except through the manhole. The repairs to be made by Houston consisted in putting two rivets through a grab-iron on the end of the tank. In order to do this work, it was necessary to place the grab-iron in position and fasten it with temporary bolts running through the holes in which the permanent rivets were to be driven. The grab-iron was held in place by these bolts. One bolt would be taken out and a rivet inserted in its place and driven up and made secure. Then the same operation would take place with the other bolt and rivet. The rivets might be either inserted from the inside and driven or hammered down on the outside, or they might be inserted from the outside and driven or hammered down on the inside. In either of these cases, it was necessary first to heat the rivets red hot. When Houston and his assistant arrived at the car, they took the top off the manhole. A ladder was then placed inside of the tank and Houston sent his helper, Wallace Elliott, down into the tank to insert the bolts in the grab-iron so as to hold it in place until the rivets were inserted.

Elliott was in the tank from a minute to a minute and a half, and came out of the manhole with his eyes streaming with water and said to Houston that the gas was too strong for him, and he could not stand it. One of the other workmen who was then present, P. C. Jones, went half way down the ladder into the tank car to insert and hold the rivet, but would go no further and came up and said that it smelled so strong in there that "he had no business in there." Another one of the workmen who was present went to the manhole and leaned over it, but did not go in. Houston then said that he would go in and hold the bolt himself, and asked one of the other workmen to drive the rivet for him on the outside. There was a portable forge alongside the car, and Houston requested one of the workmen to heat the rivet and pass it to Elliott, and told Elliott to drop it down to him in the tank, and that he would insert it. Houston went into the tank, and the rivet was heated, as directed by him, and Elliott dropped it through the manhole, as requested, and almost immediately there was one explosion followed by another, and the tank was in a blaze, and Houston was burned so badly that he died shortly after being taken out of the tank. None of the witnesses knew the nature of the gas in the tank, or expected any explosion to take place when the red hot rivet was dropped in. All testified that there was a very strong odor, but the nature of it they could not describe. One of them stated that it was more stifling than anything else, and made his eyes run water. Nor did any of them know what had been the contents of the tank, though after the accident some little oil was found around the valve in the bottom of the tank. Alongside of the tank car and in good working condition was a line of hose charged with compressed air and connected with the compressed air machine, which was available to blow out the tank if desired. The railroad company had printed rules for the guidance of its employees, and

among them was Rule 52, which is as follows: "Engines will have steam blowed off and blowers provided when possible to do so before a boiler-maker will be required to work in a fire box. Tanks will be cleaned out before boiler-makers will be required to work inside of them." There was no other printed rule on this subject, but it appeared from the evidence on behalf of the defendant, which was not contradicted, that the latter part of this rule was made and had reference only to tanks of locomotive tenders, and it was well understood by the workmen that it applied only to such tanks and that it was the duty of the boiler-maker, or the repairer, if he desired the tank to be cleaned out before working in it, to report the fact to the foreman, so that he might have it cleaned out. It was not necessary to clean all tanks, but only those found to be dirty.

The defendant demurred to the evidence on three grounds: (1) That the defendant was not negligent; (2) that the death of the plaintiff's intestate was not proximately caused by any act or omission on the part of the defendant; and (3) that the plaintiff's intestate assumed the risk of going into the tank and ordering the hot rivet to be thrown in to him. The trial court seems to have rested its conclusion on the ground last stated.

We are of opinion that Rule 52, mentioned above, has no application to oil tank cars such as was used in this case. The context of the rule would seem to indicate that the rule was restricted to the engine tender tanks of locomotives, and that it was so restricted is stated to have been well understood among employees of the company, which statement is not denied by any evidence on behalf of the plaintiff. But even if the rule was applicable to oil tank cars, used in interstate commerce, the undisputed testimony shows that if a boiler-maker desired a tank car cleaned out before using it, it was his duty to notify his superior and have it cleaned out, but no such notice was given in the instant case.

We have been unable to discover from the evidence any actionable negligence on behalf of the defendant. The rule that it is the duty of the master to use ordinary care to provide a reasonably safe place in which the servant is to work does not generally apply where the servant is sent to make repairs in order to render the place safe. In the instant case, the defendant had no knowledge of the danger which resulted in the death of the plaintiff's intestate. The foreman of the defendant went with the intestate to the car, which was spoken of in the evidence as a Texas oil tank car, and pointed out to him the tank and instructed him to rivet a grab-iron on the end of the tank. The intestate was an experienced boiler-maker, and he well knew (indeed it was a patent fact) that the work to be done by him could only be done by going, or sending his helper, into the tank. There was no means of access to the inside of the tank except through the manhole on top. This he found fastened down. Lying alongside of this tank was a line of hose charged with compressed air and connected with the compressed air machine, and readily available to blow out the tank, if necessary. When he opened the manhole, if it was not safe to enter the tank, he had but to use the instrumentality provided by the company to render the inside of the tank entirely safe. It was not the duty of the company, under the circumstances, to send another employee to blow out the tank, which the intestate could do as well as any other. The company knew that he was an experienced boiler-maker, and that he was as competent to discharge this duty as any other servant it could send. He was sent to repair a tank which had only the day before been placed on the repair track. The company knew nothing of the contents of the tank, but both he and the company knew that in order to make these repairs it would be necessary for him to go inside the tank. No notice of this fact was necessary. It was his duty to inspect for himself the

place where he was to work. He was sent to make repairs. He was furnished with all the appliances necessary to do the work, and we are unable to see that the defendant failed to discharge any duty which it owed to plaintiff's intestate.

But aside from this, if it be conceded that the defendant was negligent, the plaintiff's intestate assumed the risk which resulted in his death. It has been repeatedly held by this and other courts that assumption of risk is a matter of contract, and that contributory negligence is a matter of conduct. *Ches. & Ohio Ry. Co.* v. *Meadows,* 119 Va. 57, 89 S. E. 244, and cases cited. But the distinction has not always been observed in the application of the law to the facts of particular cases. By the contract of service, the servant impliedly assumes the risk of all dangers that are naturally and normally incident to that service, and not due to the master's negligence. *Gila Valley R. Co.* v. *Hall,* 232 U. S. 101, 34 Sup. Ct. 229, 58 L. Ed. 521. The servant also assumes, by his contract of service, the dangers thereafter arising in the course of his employment which become known to him, or which by the exercise of ordinary care on his part ought to become known to him, including, of course, all open and obvious dangers. As to such dangers arising after entering into the contract of service, it is the duty of the servant to bring them to the attention of the master and ask their removal, and if the master refuses to remove them, the servant should quit the service; but if he fails to notify the master, and continues in the service when he knows or ought to know of the danger, he thereby assumes the risk. It is a part of his contract of service that he will thus assume such risks. He impliedly agrees at the time of entering into the contract of service that, as to such dangers, he will either report them and have them remedied, or else will assume the risk of them, if he continues in the service. As to this class of dangers, the rule is the same whether the master be guilty of negligence or

not. In order to charge the servant, however, with the assumption of the risk of dangers of this nature, the must be so patent as to be instatnly recognized by persons familiar with the business and accustomed to the service. The particular injury sustained need not have been apprehended nor the danger thereof fully realized, but the servant must know and appreciate the fact that the service in which he is about to engage involves the risk of danger to him, or be chargeable with such knowledge, before he can be held to have assumed it. If the servant understood, or ought to have understood, that the existence of certain abnormal conditions exposed him to the risk of injury, he cannot recover damages for an injury actually received, although he did not fully realize the extent or character of the injury which might be sustained, or did not appreciate every particular of the risk, or all the possible consequences thereof. If he knows of the physical conditions, it is not necessary that he should be conscious of, or have in mind, a particular danger. If the danger might reasonably have been apprehended by a person of ordinary care and prudence, with full knowledge of the facts, it is enough that he knows, or is chargeable with knowing, that the particular act he is about to perform involves the risk of personal injury to himself. *Feely* v. *Pearson Cordage Co.,* 161 Mass. 426, 37 N. E. 368; *L. & N. R. Co.* v. *Kemper,* 147 Ind. 561, 47 N. E. 214; *Fontaine* v. *Johnson Lumber Co.,* 76 N. H. 163, 80 Atl. 338; *Smith* v. *United Lumber Co.,* 71 W. Va. 749, 77 S. E. 330; *Southern Ry. Co.* v. *Mauzy,* 98 Va. 692, 37 S. E. 285; *Jacobs* v. *Southern Ry. Co.,* 241 U. S. 229, 36 Sup. Ct. 588, 60 L. Ed. 970; 26 Cyc., p. 1202; 3 Labatt M. & S. (2d ed.) pp. 3170, 3217, and cases cited; Note, 38 C. C. A. 314.

Counsel for the plaintiff in error insist that "unless Houston knew of the danger of explosion, he did not assume the risk." We cannot assent to this proposition. Even if it were necessary that the particular danger (an explosion)

should have been apprehended, Houston would have been held to have assumed the risk, not only if he *knew,* but if, in the exercise of ordinary care, *he ought to have known of the danger of an explosion.* The facts of the following cases cited for the plaintiff in error are so entirely different from those in the instant case that we do not regard them as in point: *Woodruff* v. *Yazoo, etc., R. Co.,* 127 C. C. A. 411, 210 Fed. 849; *Kirbe* v. *Southern Ry. Co.,* 16 Ga. App. 49, 84 S. E. 491; *St. Louis, etc., R. Co.* v. *Conley,* 110 C. C. A. 97, 187 Fed. 949.

Many cases, of the highest authority, hold that the mere knowledge of defects of machinery or place of work, without knowledge and appreciation of the fact that they occasion danger to the servant in the discharge of his duties, will not defeat a recovery against the master, unless the danger is so obvious as to charge the servant with knowledge thereof (see cases cited in 26 Cyc. 1201-2); but we do not understand them as conflicting with the views hereinbefore expressed. If the servant has full knowledge of all the physical conditions, he is chargeable with knowledge of all the resulting dangers proximately resulting therefrom which would be obvious to a man of ordinary care and prudence. He need not have had in mind at the time he assumed the risk the particular danger which subsequently resulted in his injury.

Furthermore, as to dangers arising during the course of the employment, and of which the master and servant are equally ignorant, the law is well stated and the authorities therefor cited in 26 Cyc. 1202-3, as follows: "The general rule is well settled that where the master and servant are possessed of equal knowledge, or means of knowledge, of defects or dangers, or where they are equally ignorant thereof, the servant assumes the risk; and the same is true *a fortiori* where the servant has better means of knowledge than the master. But if the master knows, or is under an

obligation to know, of dangers of which the servant is ignorant, and of which he is not under an equal obligation to know, there is no assumption of risk." In the instant case, the servant certainly had at least equal knowledge with the master of the condition of the car to be repaired. In *Chesapeake & Ohio Ry. Co.* v. *Sparrow's Adm'r,* 98 Va. 630, 644, 37 S. E. 302, it was held, "that a servant who knows the unsafe condition of the place in which he is working, or of the machinery, materials or appliances he is using, is not compelled to continue the work, but if he does continue it, without exercising ordinary prudence and care for his own safety, he must be held to have assumed, not only the risks ordinarily incident to the service when he entered upon it, but such as become known to him during the progress of the work, or which were readily discernible to a person of his age and capacity in the exercise of ordinary care." This statement of the law is fully sustained by the cases cited in support of it, and we have no disposition to depart from it.

No one can read the recital of facts hereinbefore given without anticipating the results which actually followed. The intestate's helper first went into the tank to insert the bolts. He was in the tank from one minute to a minute and a half, and came out with his eyes steaming with water, and stated that the gas was so strong in the tank that he could not stand it any longer, and that he believed if he had stayed there a minute longer he would not have been able to have gotten out. Another workman who was present got only half way down the ladder into the tank before he came back and said that it was too strong for him, and still a third workman leaned over the manhole and also found that the odor was very strong. In the face of these facts the intestate declared his purpose to go into the tank himself and insert the red hot rivets, and directed a rivet to be heated red hot and dropped in the tank to him. The

intestate was an experienced boiler-maker. The tank on which he was to make repairs was an oil tank car. He found it closed when he came to do his work. He knew that it had not been ventilated, but took no steps to ventilate it, though the facilities therefor were readily at hand. He also knew from the experience of others that it was not safe to enter it. At least two persons reported a very strong and pungent odor in the car, and while it does not appear what had been transported in the car, yet the character of the car itself was an advertisement to him of what had probably been transported in it—that is, either oil, gasolene, or something of the kind. He is chargeable with notice of the fact, which is common knowledge, that if oil is left in a car of this kind, tightly closed, gases are likely to arise, and that such gases are inflammable. His own senses must have informed him of the presence of gas in the car, and while the witnesses testify that they did not know the nature of the gases, or that they were inflammable, still he is chargeable with knowledge of facts sufficient to show that it was dangerous to bring fire into contact with the contents of the car. This danger was patent, open and obvious, and when he directed a red hot rivet to be dropped into the tank, he assumed the risk of the consequences.

It is true that those present and assisting in heating the rivet and dropping it into the tank testify that they did not think there would be an explosion, and from this it is argued that the danger could not have been so patent as to charge the intestate with the assumption of the risk thereof (citing *Choctow, etc., R. Co.* v. *Jones*, 77 Ark. 367, 92 S. W. 244, 4 L. R. A. (N. S.) 838, and note 7 Ann. Cas. 430), but the fact is they do not appear to have done any thinking at all. With this knowledge of the conditions in the tank, they saw the intestate enter the tank that two of their number would not stay in, without a word of remonstrance,

or even a suggestion of danger; and doubtless if they had been asked if they thought there was any danger from gas, they would have answered that question also in the negative. We cannot attach grave importance to thinking of that kind. "The law requires that men shall use the senses with which nature has endowed them, and when, without excuse, one fails to do so, he alone must suffer the consequences, and he is not excused when he fails to discover danger, if he made no attempt to employ the facilities nature has given him." *Day* v. *Cleveland, etc., R. Co.,* 137 Ind. 210, 36 N. E. 854.

For these reasons, we are of opinion that there was no error in the judgment of the court below, and the same will be affirmed.

*Affirmed.*