## GALLEY v. SMITH.

(District Court, D. Maine. April 23, 1921.)

No. 676.

**1. Master and servant ⬅137(1)—Stevedore's injury held actionable.**

A contracting stevedore *held* liable for injury to an employé by the dumping of a bucket of ballast while being raised through a hatch, caused by the catching of a slack wire fall on the dumping latch, where the apparatus was being used in a dangerous manner and without warning to the workmen below.

**2. Master and servant ⬅105(1)—Following custom not conclusive evidence of ordinary care.**

While custom may be shown as bearing on the question of ordinary care, the fact that apparatus or appliances used were those used in general is not conclusive, and such evidence must further be considered in connection with the circumstances of the particular case.

In Admiralty. Suit by Frederick J. Galley against Robert M. Smith. Decree for libelant.

Raymond S. Oakes, of Portland, Me., for libelant.
Strout & Strout, of Portland, Me., for respondent.

HALE, District Judge. [1] On May 27, 1920, the steamship Freedom was lying, tied up to one of the Grand Trunk wharves, in Portland. She had come into port on the day before, light, with ballast consisting of slag and stone, a part of which had been dumped into the lower hold of the vessel, and a part into the second deck, some 10 feet below the upper deck. The respondent, Robert M. Smith, a contracting stevedore of Portland, had a crew of stevedores unloading this ballast from the second deck. The libelant, Frederick J. Galley, was a member of that crew. The method of lifting the ballast was as follows: Just aft of the hatchway on the top deck were placed two winches, each with a boom; one was known as the lifting winch; its boom was made fast over the center of the hatchway; the other, known as the burden winch, had its boom made fast, so that it extended over the side of the ship, above a scow lying alongside. Two steel cables, or falls, were employed, one running from the lifting winch up along the boom, and hanging from the boom into the hatchway; the other cable ran from the burden winch, out over the side of the ship, along the boom, and then back across the deck, over the hatch rail, into the hatchway. The ends of these two falls were joined, and attached to a hook, which was hooked into the bails of the various buckets used in the work. Neither the winchman on the lifting winch, nor the winchman on the burden winch, while running his winch was able to see down into the hatchway.

The buckets were shaped like an ordinary coal hod, except that the points where the bail was attached, on the opposite sides of each bucket, were slightly below the center of gravity. The rear of the bucket bulged out, forming a counterbalance, so that the points where the bail was attached in the sides would be nearly in the center of balance, in

whatever position the bucket was hanging; and on this axis the bucket could easily be turned from an upright position to a dumping position, or could be turned back again. The lip of the bucket was slightly heavier than the rear, so that there was a tendency on the part of the bucket to tip, and, when loaded, to dump itself; this tendency to tip, when loaded, necessarily varied with the way in which the load was placed in the bucket. The tendency to tip was overcome by a lever handle, or latch, so arranged that it could drop into a slot and hold the bucket in position when upright in the bail; and when it was desired to dump the bucket the latch was lifted out of the slot by the hand; there was no spring connected with the latch.

This was the method of working: When a bucket was filled in the hold, the hook, attached to the falls, was hooked into the bail of the bucket. The bucket was brought out into approximately the center of the square of the hatch, and raised directly by the lifting winch; meanwhile the winchman on the burden winch took care of his slack as best he could, until the bucket came in sight. He then took up his slack and gradually took the bucket and carried it to the side of the ship and swung it over, the winchman on the lifting winch gradually releasing his hold; the two working together in the best way they could. At the time of the injury, about 1 o'clock in the afternoon, the libelant had been working all the morning, and had worked part of the previous day. He had cleared away his side of the pile from under the coamings and was loading his bucket. While he was doing this, the bucket of another crew on this job was being lifted; and when it was approximately on a level with the top deck, 10 or 12 feet above Galley, the contents were dumped on him, and the injury occurred for which he brings this suit.

The libelant contends that the respondent failed to exercise the care of a reasonably prudent man, in that he provided a bucket for his use which would dump itself by a slight lift on a protruding lever handle, or latch, such handle being liable to be raised accidentally while the work was going on, the handle having no safety catch or any other device which would prevent its being accidentally lifted; that having provided such bucket, with a latch liable to be lifted by accidental means, the respondent failed to provide a reasonably safe method of lifting the bucket; but that he did provide a line pulling taut to lift the bucket, and another line running slack, and intended to be pulled taut while the bucket was rising, and so to rise past the lever handle in such a way that it would be liable at any time to catch the lever handle and lift it, thus dumping the bucket; that the respondent failed, also, to warn the libelant that there was danger of the bucket being dumped upon him while he was working in the hold, and that in order to be perfectly safe, he should step aside, out of the square of the hatch, while a bucket was being lifted over his head.

The learned proctor for the respondent urges that the respondent is not an insurer, and that he provided reasonably safe appliances, such appliances as prudent, intelligent, and experienced men usually employ, under like circumstances, to guard against dangers ordinarily to be anticipated; that he used a bucket considered to be of the safest

type ever made, and such as was customarily used in this port and along the whole Atlantic seaboard, under like circumstances; that he used it with reasonably safe appliances, such as were in ordinary use; that he was not guilty of negligence; but that, if the libelant suffered from anybody's negligence, it was from the negligence of fellow servants.

There is some dispute as to the exact cause of the accident. In the fifth interrogatory propounded by the libelant, the respondent is asked to produce and annex a copy of the report of the accident which had been furnished to the insurer. In answer to this interrogatory the respondent furnished a copy of the insurer's report, as follows:

"The gang was discharging ballast from the hold. While the bucket was being hoisted up, the fall caught against the catch on the bucket, and the contents of the bucket were upset, some of the contents striking Galley before he had time to get out of the way."

In his answer, the respondent explains this report, saying that he has been—

"unable to find any one who actually knows whether the bucket was dumped by the line of the second winch catching under the lever arm, as claimed in the libel, or whether the lever was not properly fastened by the workmen in the hold, before it was raised, or whether from some other cause."

The weight of the testimony tends to show that the injury happened substantially as stated in the original insurance report. Nobody saw precisely what lifted the latch; but the evidence shows that the fall, or cable, of the burden winch could be seen after it got above the coamings, and that it was twisted round the bucket; one witness says, "It was twisted round three or four turns," and that he had known buckets "to wind up the same way before." Another witness says that it was "wound round the bucket." Silke, the hatchman, saw the "fall catch under the trip," but did not see that the fall was wound around the bucket.

The preponderance of the proofs tends to show that the dumping was caused by the fall catching "against the catch on the bucket," as set forth in the insurance report. The arrangement of the falls, and the location of the winchman, is not in dispute; it is admitted that they were capable and careful men. The proofs lead me to believe that they did the best they could with the appliances provided. Ferns, the owner of the bucket, testifies that the steel cable running off from the drum, when lowered into the hold, would, if it had an opportunity, naturally coil itself, that it would "work itself round," and that "if the winchman who has the burden winch would slack it down 15 or 20 feet it would fall on top of the bucket and eventually find its way around it." How much the fall was coiled around the bucket the evidence does not make clear, but it tends to show that it was coiled enough so that it caught under the protruding lever handle and raised it, causing the bucket to dump. Ferns says that he had seen a bucket dumped by striking the coamings of the hatch or a stanchion. He does not say how often he had seen such dumping.

There is evidence tending to show that a pennant line, 6 or 8 feet long, was sometimes used for the purpose, among other things, of

keeping the slack fall clear of the bucket, but that no pennant line was used by the respondent. Whether such pennant line would have tended to prevent the coming together and twisting of the two lines it is not necessary to decide.

The whole evidence makes it clear that the protruding lever handle, when used with the system of two falls, arranged as they were at the time of the injury, constituted a danger which should have been apparent to a reasonably prudent man.

[2] I admitted evidence tending to show that this bucket is of a kind now generally employed along the Atlantic seaboard. Such evidence is to be used with caution. In the Maine court, Mr. Justice Barrows said:

" 'Custom' and 'average' have no proper place in the definition of ordinary care." Mayhew v. Sullivan Mining Co., 76 Me. 100, 111, 112; Topsham v. Lisbon, 65 Me. 455; Grand Trunk v. Richardson, 91 U. S. 454, 23 L. Ed. 356; Congdon v. Howe Scale Co., 66 Vt. 255, 29 Atl. 253.

In Maynard v. Buck, 100 Mass. 40, 43, in speaking for the Massachusetts court, Mr. Justice Wells allowed evidence of the usual practice or mode of proceeding under like circumstances—

"not to prove a custom, in the strict sense of that term, but to show the course of proceeding ordinarily pursued, as bearing upon the question of what is ordinary care." Cass v. Boston & Lowell R. R. Co., 14 Allen (Mass.) 448.

See, also, Southern Pacific Co. v. Gloyd, 138 Fed. 389, 391, 70 C. C. A. 528.

In the case before me the evidence does not show, and cannot show, under what circumstances or with what precautions this bucket, with its appliances, is used in American ports. Although such testimony is received, its probative value is affected by this consideration.

When we examine the bucket, we find that, in order to make it workable, its bail had to be attached to the bucket on pivot pins below the center of gravity, so that the bucket would tip readily. In order to do its work it must tip readily. The latch was the only thing which prevented its tipping; and this latch had to be made so that it would yield to a light touch, and to protrude in such a way that it could be caught hold of when it was required to dump the bucket. Whether or not there was any safety device provided in the original design of the bucket, and whether a notch or slot, which appears in the drawing of the device, was for the purpose of introducing such safety device, does not appear. No safety device was used by this respondent. The bucket had to be so arranged that the lifting of this light steel latch would immediately dump the contents. The dangers of the use of such a bucket were so apparent that, in my opinion, a reasonably prudent man must have known that he ought to exercise great care in providing appliances to raise the bucket in such a way as to avoid the handle striking the coaming, and in such a way that neither of the falls or cable should become entangled with the latch. If necessary, only the lifting winch might have been used, thus eliminating the dangers inherent in the two fall system, even though more time was required in doing the work which the burden winch was intended to do. If two

falls were used, the testimony induces the belief that a pennant line, 6 or 8 feet long, properly arranged, would have obviated some danger of the slack cable twisting around the bucket.

The testimony leads me to the conclusion that the respondent was not free from fault, but that he ought to have foreseen the dangers of the use of such an instrumentality, with its protruding latch; that he ought to have provided some safer method of lifting the bucket. The testimony leads me to the conclusion, too, that, if the respondent undertook to use this kind of a bucket, with the system of two winches, involving the use of two falls, liable to twist, and without any device such as a pennant line to lessen the danger of the slack cable twisting around the bucket and lifting the latch, he should have recognized the hazards attending such use, and should have warned his workmen that there was some danger in standing under a rising, loaded bucket, and that, as a proper means of safeguarding their lives, they should step outside the square of the hatch, while a loaded bucket was ascending. It is not claimed that any such warning was given. It is not contended that the libelant was at fault.

From the whole testimony I am constrained to find the respondent at fault, and liable for the damages sustained by the libelant. The case is referred to George F. Gould, Esq., assessor, to report the amount of such damages. On the coming in of the assessor's report, I will pass upon all questions relating to damages. The libelant recovers costs.