# Staunton.

## Norfolk and Western Railway Company *v.* Anna M. Lumpkins, Administratrix, etc.

September 20, 1928.

The opinion states the case.

*Barnes Gillespie, W. B. Kegley, T. C. Bowen* and *F. M. Rivinus,* for the plaintiff in error.

*N. Clarence Smith* and *James S. Kahle,* for the defendant in error.

HOLT, J., delivered the opinion of the court.

The defendant (plaintiff in error) is a common carrier, and maintains a service station at Pocahontas, Virginia, where its engines take on coal, water and sand. There were two "hostlers" there, plaintiff's decedent

and one J. A. Haley, whose duty it was to supply those things, wipe off and polish the engines, and do such other casual work on them as might be necessary. J. A. Black was "agent and yard master, a kind of supervisory position," and had been in charge since 1915. The locomotives served at this yard were engaged in hauling trains in interstate commerce, and so the decedent was himself at work in that service.

In 1916 the railway changed its motive power on this Pocahontas branch from steam to electricity, and notified all of its employees by a circular of that fact. This circular told them that the wires were charged and carried heavy voltage.

Power is conveyed through trolley wires held over the track by wires known as span wires, there being an upper or service span wire and a lower or steady span wire. This construction serves to brace, hold taut and in place the trolley wires. The span wires extend across the trolley wire at right angles, and are attached to poles on either side of the track. The lower span wire is clamped to the trolley wire. Both are uninsulated and charged with the full power used in moving trains, in this instance eleven thousand volts.

Before the electricity was installed there stood in the yard an old style water tank whose roof was about twenty-five feet high. The tank itself sat on a trestle. Access to its interior was had through a man-hole on the roof, reached by two ladders, one from the ground to the trestle base, and one from its base to the roof where the man-hole was. The tank itself was probably about twelve feet deep. Water for engine tenders was drawn through a spout from near its bottom, and was shut off by a valve when the tank was not in actual use. When in use, the spout was swung over the locomotive tender, and the valve was

lifted by a rope which ran outside on a pulley. It was only by the lifting of this valve that water could be gotten at all.

On the evening of February 19, 1926, the section foreman reported to the yard master that there was trouble at the water tank, and that the rope, which raised the valve, was broken. He transmitted this report to the decedent, to Haley and to Black, the agent. Soon after, and between six-thirty and seven o'clock, decedent, for the purpose of making necessary repairs, went up these ladders to the man-hole in the roof of the tank. He took with him a torch and an iron hook. This hook was too short to reach to the bottom of the tank where the valve was, and he asked Haley to hand him a longer one. This Haley did. In a short time Haley noticed an electric flash, and the playing of flames along the iron bands on the tank. As soon as possible the power was cut off. Lumpkins was then dead. His body was found astride the edge of the tank at the man-hole, The left foot on the inside and the right foot on the outside. One end of this iron hook rested on the lower span wire, and it extended from this point of contract across the upper part of his thigh over the man-hole. At the time of this accident, it was cold and raining, "dusk dark," and there was some ice.

Lumpkins was a man of good health and habits, about forty-seven years old and had been with the railway for twenty-five years as fireman, engineer and hostler. This last position he had held since 1913. He left to survive him a wife and seven children, the oldest being about eighteen years old.

In due course his administratrix brought this action. The declaration presents alternate phases of the plaintiff's case, one upon the Federal Employers' Liability

Statute (45 U. S. C. A. sections 51-59), and the other upon the Virginia Railway Employers' Liability Statute (Code 1919 sections 5791-5796). A special jury, at the instance of the defendant, was drawn, and in due course it returned into court a verdict for the plaintiff in the sum of $25,000.00, which rests, of course, upon the fact that decedent was engaged in interstate commerce.

The defendant moved that it be set aside as contrary to the law and evidence, and because there was no evidence to support it, and as a part of this motion asked that final judgment be entered for the defendant. Without waiving its request, it also asked that the judgment be set aside for like reasons, and a new trial ordered. The court, upon consideration, overruled these requests, and entered judgment for the plaintiff. Exception to all of this was saved by proper bills, and the case is now before us on a writ of error.

We have seen that there was a verdict approved by the trial judge, and so, upon familiar principles, we take it practically as on a demurrer to the evidence.

The defendant's major claims are that it was guilty of no negligence, and that recovery is also barred because Lumpkins assumed the risk which resulted in his death.

The lower span wire, or steady span wire, as it is sometimes called, was clamped to the trolley wire and passed within five feet eight inches of the edge of the tank where Lumpkins was killed. There is some dispute as to this distance, but we think that the defendant's evidence must control. It rests on actual measurements. This stay wire carried the same voltage that the trolley did—11,000 volts.

Since Congress, by the act of 1908, took possession of the field of employers' liability to employees in

interstate transportation by rail, all State laws on this subject are superseded. *Second Employers' Liability Cases*, 223 U. S. 1, 55, 32 S. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44.

■ Was the defendant negligent in permitting an uninsulated wire so charged to stand within five feet eight inches of this man-hole? Defendant says that it was not, and for two reasons, one being that the National Electrical Safety Code of the Bureau of Standards of the United States permits it.

This matter is dealt with in section 247 of the building code, subsections c, f and b. These sections are:

"(c) Clearance, low voltage lines.—Supply conductors between 300 volts to ground and 7,500 volts (unless in grounded conduit or metal sheathed cable or otherwise adequately guarded or rendered inaccessible) shall be so arranged that they do not come nearer than three feet, measured horizontally, from any point on the surface of a building or its attachments nor nearer than eight feet above the top of any building or above any balcony or other platform crossed over."

"(f) Clearance, high voltage lines.—Conductors operating at over 7,500 volts (unless in grounded conduit or metal sheathed cable or otherwise adequately guarded or rendered inaccessible) shall be so arranged that they clear the surfaces of roofs of buildings or their attachments by not less than eight feet up to 15,000 volts and ten feet for higher voltages. They should not be carried over buildings not concerned in the operation of the utility owning them where this can be avoided."

Under subsection b of this section, it is said:

"Open supply conductors, passing under, over or near a bridge (other than brick, concrete, or masonry, requiring infrequent inspection or repair), when at-

tached thereto, shall, when practicable, be so arranged that they do not come within the following distances from any portion of the bridge or abutments," etc.

Here, for a voltage of from 7,500 to 15,000, the clearance is five feet, and this last subsection, it is said, applies to the instant case.

It would seem that a water tank should be classed as a building rather than as a bridge. If it were used to store sand and stood on the ground nobody would doubt that it was a building, and its character is not changed by the fact that it actually is used to store water and was on a trestle. Moreover, it is clear, when we look at these specifications, that the safety of people was not the only matter in mind when they were written, certainly not the major matter, for they permit naked wires carrying up to 7,500 to be placed within three feet of a building, while one carrying over that voltage must be placed eight feet distant and in no event less than five. Now to touch one of these wires would be as fatal as it would be to touch the other. One must be three feet away, and one must be five or eight. The purpose here was to prevent the current from arcing, or leaping, to near-by structures. It can hardly be contended that it would be reasonably safe to put a man to work between a wire and a wall only three feet apart, when to touch the wire means death, and custom cannot make it so.

It is also said that a clearance of five feet is all that is required in ordinary usage by other roads, and that when this unbending test is met negligence cannot be imputed. *Norfolk, etc., Co.* v. *Ellington's Admr.*, 108 Va. 245, 61 S. E. 779, 17 L. R. A. (N. S.) 117, and *Southern Ry. Co.* v. *Chadwick*, 144 Va. 443, 132 S. E. 191.

This unbending rule does not appear to have met with wholehearted approval at the hand of the Federal courts. In *Southern Ry. Co.* v. *Miller*, 267 Federal 376, the circuit court of appeals said: "It is argued at length and with much earnestness that defendant is shown to have done all that is customarily done in like circumstances and therefore should stand excused. There are two answers to the contention: Evidence of custom is always competent and often highly persuasive, but it cannot be held to be conclusive. The true test, after all, is what would be done by a reasonably prudent employer in the particular situation, and where that situation is peculiar and unusual the rule of custom has but limited application, because the basis for reliable comparison is wanting."

In *Texas & Pacific Railroad Co.* v. *Behymer*, 189 U. S. 468, 23 S. Ct. 622, 47 L. Ed. 905, Mr. Justice Holmes observed: "What is usually done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it is usually complied with or not."

Upon the same general subject, see *Wabash Ry. Co.* v. *McDaniels*, 107 U. S. 454, 2 S. Ct. 932, 27 L. Ed. 605; *Midland Valley R. Co.* v. *Bell*, (C. C. A.) 242 Fed. 803; *C. M. & St. P. Ry. Co.* v. *Moore*, 166 Fed. 663; and *Galley* v. *Smith*, (D. C.) 272 Fed. 999.

These authorities seem to show that while custom and usage, to show what is reasonable, is evidence of high character, it is not always conclusive.

The rule, however, here relied upon is not of major importance. Decedent was not working in his line of duty at the time he was killed. So far as the record shows he had never been upon this tank. Its care rested with the department of maintenance of ways, and while there is conflict of evidence, taking the case

as it comes to us, this man on a dark night was ordered to do work with which he was wholly unfamiliar, and in a place to which some danger certainly attached.

In dealing with such a situation, Shearman & Red. Neg. (6th ed.) section 207-i, said: "A servant thus directed to undertake work outside of that which he had engaged to do is not presumed to be aware of its peculiar risks; and, therefore, if the master does not fully explain them to the servant before putting him at such new work, the servant is entitled to assume that it has no greater risks than those which attach to his regular work, either in the nature of the work itself or in the habits of fellow servants with whom it brings him into contact."

In *Virginia Portland Cement Co.* v. *Luck*, 103 Va. 427, 49 S. E. 577, the court said: "If the deceased was working outside of the scope of his employment, he was working under the direction of the defendant, and for its benefit, and greater care was required of the defendant toward him under these circumstances than if he had been working in the regular line of his employme it."

See also *Jacoby Co.* v. *Williams*, 110 Va. 55, 65 S. E. 491.

These authorities are sufficient to establish the proposition that it is the duty of an employer to give special caution to a servant sent out of the line of his employment into a place of danger, when he is ignorant of the actual situation, or does not appreciate its perils.

Men assume the ordinary risks incident to their work, and they assume risks from perils open and obvious, and not only risks from perils known, but from perils which with ordinary intelligence they should have known. Devices for delivering mail to moving

trains are used on all standard roads. Of necessity they stand close to the track. Mail clerks assume the risk of being struck by them as one incident to their employment, but surely if a clerk from the auditing department, who had never been in a mail car, was drafted in an emergency to do this work, he should be told of its dangers, and it would not be a defense, if he were hurt, to say to him that these delivery posts were where the usage of service demanded. It is sometimes said that one who applies for a position will be deemed to know its perils, but it is never held that one drafted to new work should not be informed of danger known only to the master. It is probable that the agent, Black, wh on this occasion represented the railway, knew no more about where these wires were placed than Lumpkins did, but it was supposed to know and was charged with knowledge.

■■ When Lumpkins was sent to do this work, if there was nothing in the situation which would have justified reasonable men in believing that danger could reasonably be anticipated, then the defendant, as a matter of law, was not negligent. A master is only required to notify a servant of the possibility of an accident when its possibility may have been reasonably anticipated. What did the defendant know? It knew that a heavily charged and uninsulated wire was within five feet eight inches of the place where he was sent to work. It knew that the night was dark, cold and rainy, and that this wire could not then be easily seen. It knew that the tank was twelve feet deep, and partially filled with water, and that a valve had to be lifted from the bottom by one on its top at the manhole. It knew that to do this it was necessary to have a hook of some sort long enough to reach the bottom, and that it would be awkward to handle such a tool

at that time and place. It also knew that if it came in contact with this stay wire death might result. Can it be said, as a matter of law, that no reasonable man could have anticipated any special danger? We think not, and that the defendant's negligence consisted not so much in the placing of the wire as in the failure to call the attention of this man, who was a stranger to this particular work, to the danger incident to its execution.

Is the plaintiff in the instant case precluded from recovery by the doctrine of the assumption of risk?

It does not follow that a recovery can always be had merely because the master is negligent. If the dangers following negligence are open and obvious, and the servant goes forward, he is said to assume them.

"By the contract of service, the servant impliedly assumed the risk of all dangers that are naturally and normally incident to the service, and not due to the master's negligence. He also assumed dangers thereafter arising in the course of his employment which became known to him, or by the exercise of ordinary care on his part ought to become known to him, including, of course, all open and obvious dangers." *Houston's Admr.* v. *Seaboard Air Line Ry.*, 123 Va. 290, 96 S. E. 270; and *Gila Valley R. Co.* v. *Hall*, 232 U. S. 101, 34 S. Ct. 229, 58 L. Ed. 521; and *Seaboard Air Line Ry.* v. *Wharton*, 233 U. S. 492, 34 S. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475.

We have seen that a man sent to do work out of his line of employment does not always assume all of the risks incident to it. It may be that when he offers for a position he impliedly represents himself as having adequate knowledge of the conditions of service. But one who is drafted and who does not so apply cannot be said to assume a risk not obvious and

not known to him. In such circumstances it is the duty of the master to warn.

█ It is true that Lumpkins had for many years been employed as a hostler in this yard. He knew that the railway's motor power was electricity, and that the overhead wires were charged and deadly, but there was nothing in his line of employment to direct his attention to their exact location.

In Labatt on Master and Servant, sections 1146 and 1190, are these statements of the law:

Section 1146: "It follows, therefore, that, when the servant is thus required to work amidst new surroundings or under new duties, the master becomes at once chargeable with the obligation of giving him instruction in any case where there is a real augmentation of the risk, owing to the fact that the servant has not sufficient experience or intelligence to enable him to safeguard himself."

Section 1190: "To bring a case within the scope of the doctrine now under discussion, it must be shown that the servant possessed a sufficiently exact appreciation of the nature and extent of the danger in question to enable him to estimate the possibilities of his environment in so far as they affected his bodily safety. The absence of that appreciation is logically incompatible with the hypothesis that, in undertaking or continuing in the employment, he exercised that intelligent and deliberate consent which is one of the essential elements involved in the conception of an assumption of a risk."

Read in connection with the issues here, the case of *E. I. DuPont Co.* v. *Taylor*, 124 Va. 750, 98 S. E. 866, is quite instructive. There the plaintiff, out of his line of duty, was put to work loading and transporting gun-cotton on a tramroad in the defendant's plant.

He was struck down and injured by an overhead pipe too low to permit his safe passage while standing on the tramcar. This statement in the petition for a writ of error shows just what the issue was:

"As a basis for the consideration of the affirmative defenses of assumption of the risk and negligence, in detail, it is submitted that the plaintiff knew or was charged with knowledge of conditions that affected his safety as an employee."

There a servant was put to work by the master out of the line of his employment. Judge Burks, speaking for the court, said: "Much has been said in the argument about 'opportunity for knowledge,' as though it were always the equivalent of imputed knowledge. But such is not the case. It is only when men of ordinary prudence and observation would have observed under like circumstances that it can be so construed. Mere failure to observe when there is no occasion for observation is not negligence. It is only negligent ignorance that can be chargeable as the equivalent of knowledge. Knowledge of general conditions will not comprehend a particular danger, where men of ordinary care and prudence, placed in the same circumstances, and using their faculties in the usual way, would not have apprehended such danger. If the failure to observe, however, amounts to negligence, then observation will be imputed."

In his discussion of when failure to observe amounts to negligence, he cites *Lindsay* v. *New York, etc., R. Co.,* 112 Fed. 384, 50 C. C. A. 298; *Ragon* v. *Toledo, etc., R. Co.,* 97 Mich. 265, 56 N. W. 612, 37 Am. St. Rep. 336; and *Green* v. *Cross,* 79 Tex. 130, 15 S. W. 220.

In all of these cases attention is called to the fact that "there was something to bring the defect to the attention of the party injured. Some occasion to

observe, or the circumstances were such that a man of ordinary care and prudence would have observed. But in the case at bar, where we are required to draw all inference favorable to the plaintiff which a jury might fairly draw, and to reject all inferences from the defendant's evidence favorable to it, except those which necessarily flow therefrom, we cannot infer that the plaintiff had knowledge of the height of the overhead pipe lines from the ground, in the absence of any evidence of the height of such pipe line. He had never ridden on one of these trucks before. His previous employment had required him to walk about different parts of the plant, and while he may have observed the fact that there were overhead pipe lines at various points in the plant, there was no evidence that they interfered in any way with the discharge of his duties, or subjected him to any danger, or that there was any occasion for him to observe their height." *E. I. Du Pont Co.* v. *Taylor, supra.*

In that case judgment for the plaintiff was affirmed.

When is the assumption of risk a matter for the court, and when one for the jury?

In *Clinchfield Coal Corp.* v. *Cruise*, 117 Va. 645, 86 S. E. 135, it was said: "Whether an employee has assumed the risk of dangers incident to his employment may be and often is a question for the jury, but not where, as here, the alleged causes of the dangers are so open and obvious, and the knowledge or opportunity for knowledge on the part of the employee so complete, as to leave no doubt that he knew or ought to have known all about them. In such a case the assumption of the risk is a question of law, bars the recovery and is not a question for the jury. 26 Cys. 1481-2, and cases cited in note 78."

 This rule was reaffirmed in *Southern R. Co.* v. *Burford*, 120 Va. 157, 90 S. E. 616, and in the well considered case of *Davis* v. *Powell*, 142 Va. 711, 125 S. E. 751, 128 S. E. 242, Judge Chichester said: "The question of the assumption of risk is usually one for the jury, but it is otherwise if the evidence discloses facts upon which reasonable minds are not likely to differ."

In *DuPont* v. *Taylor*, *supra*, Judge Burks observed: "There is always a fair presumption that the verdict of the jury is correct, and when the judge who presides at the trial, who heard all of the evidence, witnessed all of the proceedings, and the manner of conducting the cause before the jury, is satisfied with the verdict and refuses to set it aside, an appellate court which cannot have an equal opportunity for forming a just judgment ought not to interfere without the strongest reason for doing so."

 These statements of the province of courts and juries embody a rule so firmly established that its elaboration is not now necessary. Two things should be left to the jury. It should be left to them to find the facts when there is conflict of evidence, and when the facts have been found, or when there is no conflict as to them, it is generally for the jury to say what inferences in reason are to be deduced. If reasonable men may fairly differ as to the facts or as to the inferences to be drawn from them, then the issue is generally for the jury and not for the court.

 Was the knowledge which Lumpkins had of the general situation sufficient to charge him with knowledge of the location of the span wire by the tank?

We are of opinion that that is a matter about which reasonable men might fairly differ, and if we are

right in this it necessarily follows that there was no error in its submission to the jury.

██ Objection was made to the fact that a photograph was submitted in evidence which showed that the span wire had been insulated after the accident. That insulation was so inconspicuous in the photograph that it is improbable that the jury's attention was called to it at all. It was introduced with the caution by the court that it could be used only for the purpose of showing to the jury the general situation, and to enable them to understand and apply the evidence. It was but a substitute for a view of the premises, and if its introduction was a reversible error, it would be possible always to exclude the jury from a view. We do not think that the doctrine of subsequent repairs is applicable, or that the trial court erred in this particular.

██ Error is assigned to the admission of this testimony of Mrs. Lumpkins:

"Q. What kind of a man was Geo. W. Lumpkins with reference to looking after the intellectual and moral education of his family?

"A. That was all of his thoughts. He was an educated man himself, a college man, he took a course in locomotive running, and that was his idea, he did not dress or anything like that, he went in common overalls, and his idea was to save his money to educate his children.

"Q. What was his attitude during his lifetime in regard to make the children go to school and things of that sort?

"A. He made them all go to school.

"Q. He insisted on them getting the advantages of education, as best he could, did he?

"A. Yes, sir.

"Q. These children have necessarily lost—

"Q. As a result of the death of George Lumpkins is there anyone to take his place in regard to this training or education?

"A. No, sir."

It is said that under section 8657, U. S. Compiled Statutes, now section 51 of chapter 2, title 45, page 1442 of U. S. Code, the sole element of damage is the pecuniary loss to dependents; and that this evidence brought to the jury other elements than those contemplated by that statute. *Am. R. R. Co. of Porto Rico* v. *Didricksen*, 227 U. S. 146, 33 S. Ct. 224, 57 L. Ed. 456.

In *Norfolk & Western Ry. Co.* v. *Holbrook*, 235 U. S. 625, 35 S. Ct. 143, 59 L. Ed. 392, the court said: "In the present case there was testimony concerning the personal qualities of the deceased and the interest which he took in his family. It was proper, therefore, to charge that the jury might take into consideration the care, attention, instruction, training, advice and guidance which the evidence showed he reasonably might have expected to give his children during their minority, and to include the pecuniary value thereof in the damages assessed."

We are of opinion that there was no error in this. ▉ It is next said that error was committed in that the court permitted the plaintiff to question the witness Haley as to his advice to Mrs. Lumpkins to compromise her case.

Haley had no authority to act for the company, and we are unable to see how anything that he did compromised its rights. He was closely associated with Lumpkins and was a friend of the family, and as such

was of opinion that it was better for her to compromise than to sue. This assignment is without merit.

Objection is also made to the statement of counsel in the closing argument, the statement objected to being: "Why didn't the plaintiff send a man down there to measure that thing? Do you know what would have happened to him if he had gone there? He wouldn't have been on that tank two seconds until he would have been yanked down off there by a railroad detective and sent to jail for trespassing."

While this may not have been justified by the evidence, this error, if any, is trivial in its nature, and certainly is not of itself sufficient to justify a reversal. Objection was also made to Instruction B in that it dealt with contributory negligence when contributory negligence was not an issue in the case. This is true, but we are not able to see that the defendant was prejudiced thereby, and so this assignment is also overruled.

We are also of opinion that there is no merit in the objections to instructions C, D and E. As is said in the petition for appeal: "While some of the testimony objected to and some of the instructions objected to might not alone be sufficient to cause the court to disturb the verdict of the jury, if it should appear that substantial justice has been done, a more liberal view of the testimony in support of the verdict would not justify the verdict if it may have been influenced by evidence improperly admitted or by instructions given unduly favorable to the theory of the plaintiff."

This is a fair statement of the character of the objections just considered.

This case turns upon the doctrine of primary negligence and upon the doctrine of the assumption

of risk, and these assignments have received careful consideration. It is true that the verdict is large, but it is not so excessive in itself as to justify a reversal.

We are of opinion that the record contains no reversible error, and that the judgment of the trial court should be affirmed.

*Affirmed.*