# Richmond

CARSON RICHARDSON RIGNEY v. RONALD EARL NEAUMAN.

October 8, 1962.

Record No. 5478.

Present, All the Justices.

*Coleman B. Yeatts* and *Joseph Motley Whitehead,* for the plaintiff in error.

*Edwin B. Meade (Meade, Tate and Meade,* on brief), for the defendant in error.

BUCHANAN, J., delivered the opinion of the court.

The plaintiff, Carson Richardson Rigney, was a guest passenger in a car being driven by the defendant, Ronald Earl Neauman, when the latter lost control at a curve in meeting a car driven by S. S. Hylton. The Neauman car left the road and struck a tree to its right. Rigney was injured and another passenger in the car was killed. Rigney brought this action for damages against Neauman

and another against Hylton. The two suits were tried together be-
fore a jury and at the conclusion of the plaintiff's evidence the court
sustained Neauman's motion to strike it out as to him on the ground
that it did not establish gross negligence, Code § 8-646.1, and judg-
ment was accordingly entered in favor of Neauman. The jury re-
turned a verdict for Hylton on the question of whether he was guilty
of simple negligence, and judgment was entered in his favor.

From the judgment in favor of Neauman we granted a writ of
error to Rigney, whose sole assignment of error is that his evidence
presented a jury question and the court erred in striking it out.

The accident occurred about 3:30 p.m., June 17, 1961, on State
Route 969 about 1.3 miles north of Callands, in Pittsylvania county.
The day was clear and the road was dry. An hour or so before
the accident Neauman, who was a member of the United States Air
Force and whose home was in Chicago, drove his Ford convertible to
Rigney's home. A friend, Wayne Barbour, was with him. There
Rigney joined them and drove the car to Barbour's home. After a
short visit they started toward Callands on the trip on which the
accident occurred. Neauman, the defendant, was driving the car
and the other two boys were on the front seat with him. Rigney,
who lived in the neighborhood and was familiar with the road, testi-
fied that after they turned into No. 969, Neauman was driving about
55 miles an hour and he, Rigney, told him to slow down for some
curves ahead and he did slow down a little. In the first of the curves
they met a car driven by a Mr. Motley. Just before they reached
the second curve where the accident happened, there was a straight
stretch of about 150 feet. Rigney said that when he first noticed the
approaching Hylton car it was in the curve only a few feet away and
in the center of the road, and Neauman's car was also in the center of
the road and Neauman "cut to the right as sharp as he could to miss
the [Hylton] car and went over in the bushes". Hylton also cut
to his right "to avoid hitting us". Neauman was then driving about
45 miles an hour, so Rigney testified.

A State trooper who arrived at the scene a short time after the
accident testified as a witness for the plaintiff. Some months later a
surveyor made a map of the road and he was introduced as a witness
by the defendant Hylton. Their evidence was to the following effect:

Route 969 runs generally north and south and was downgrade for
Neauman as he was driving south. The curve was of 32 degrees.
The hard surface of the road as it entered the curve was 21 feet wide,
with a wide shoulder on Neauman's side and a narrow one on Hylton's

side. The surface of the road was not marked by the usual white line and there was no sign to give warning of the curve or requiring a reduction of speed, and the speed limit in the area was 55 miles an hour.

Five feet from the edge of the hard surface on Neauman's side was a tire mark made by the right wheels of his car. It began at about the beginning of the curve, veered to the right off the hard surface and crossed the shoulder to the tree which the car struck, a total distance of 131 feet, about one-half of which was on the hard surface. When the Neauman car was at the point where this mark began, its left wheels were approximately at the center of the road and all four wheels of the car were then on his right side of the center.

As Hylton entered the curve from the south, his view of a car approaching from the north was limited by a bank six or seven feet high on his right. Only when he was within about 60 feet of the point where the tire mark of the Neauman car began could he see as far as 350 feet up the road. Visibility for the occupants of the Neauman car was, of course, equally limited.

Motley, driver of the car which met the Neauman car in the first curve, testified that Neauman "came in the curve too fast, and you might call it overrun the curve". He said that Neauman did not get over the center line in that curve "but he got close".

The defendant, Neauman, was called by the plaintiff as an adverse witness and testified that he approached the curve on his right side of the road and met the Hylton car which "was on my side of the road. I cut to the right which put me off the shoulder of the road for I guess it was 130 feet, which I was in soft dirt, and at 45 miles an hour I was coming up onto the curve and I couldn't get the car back on the road in the soft dirt which I was in, and I hit the tree sideways. The side of the car hit the tree." The Hylton car, he said, was coming out of the curve when he first saw it 50 to 60 feet away. He testified that he had no difficulty in making the curve in which he met the Motley car at his speed of 40 to 45 miles an hour. The trooper testified that the two curves appeared to be about the same.

Mrs. Hylton testified that she was in the car with her husband and he had completed the curve and straightened up his car when they saw the Neauman car approaching "and it was in the middle of the road probably over to our side, * * and it was coming very fast toward us". She thought it was too fast, but she couldn't say how fast and she was surprised, she said, that its occupants "didn't seem conscious of any danger".

Mrs. Staton, also in the Hylton car, said they did not see the Neauman car "until after we rounded that curve". She did not know how fast it was coming, but "I know it was awful fast" and it looked like it was in the middle of the road.

The definite testimony, however, of the trooper and the surveyor based on actual measurements from the tire mark on the road was that all four wheels of the Neauman car were on its right side of the center of the road when the tire mark began.

The trooper and a deputy sheriff who was with him testified that they noticed the odor of alcohol on Neauman and the trooper testified that Neauman told him that he had drunk two beers at Wayne Barbour's house. Neauman testified that he had one beer about 12:30 that day when he and Barbour were coming back from Danville and that he drank one beer at Rigney's house and he had no other alcoholic drink that day. There was no testimony by the trooper or any other witness that Neauman was under the influence of intoxicants at the time of the accident. On the contrary, the plaintiff Rigney expressly stated that there was no indication or appearance that Neauman had been drinking.

The only other charge on which gross negligence on the part of Neauman is sought to be predicated is excessive speed. On that question the testimony of the plaintiff himself is conclusive.

The plaintiff Rigney testified that he had driven over this road a good deal and knew the curves well; that before they reached the first curve he told Neauman to slow down because he thought he was going too fast to make the curve and Neauman did slow down to around 45 miles, and he, the plaintiff, was satisfied with that speed and did not afterwards suggest to Neauman that he slow down more than that. When they went into the first curve, he said, Neauman was driving on his right-hand side of the road and there was nothing unusual about the way he was driving; Neauman had no trouble going around that curve, and he, Rigney, had no sensation of going around it too fast. He said that they had just started into the second curve when he saw the Hylton car and the two cars were only 14 to 18 feet apart when they turned to avoid a collision and Neauman was then driving at 40 to 45 miles. He was asked these questions and gave these answers:

"Q. Is there anything he did from the time he went in the curve until the time he pulled the car to the right that you would not have done had you been driving the car?

A. No, sir, I don't reckon.

Q. Was there anything he did in driving the car on this occasion that you thought was a reckless or a negligent act?

A. Not unless it was coming in there too fast.

Q. That is the only thing you think he might have been doing— a little too fast?

A. Yes."

Hylton's counsel asked him if it wasn't true that Hylton's car had nothing to do with the accident. He replied that it did have something to do with it, and said, "How could he [Neauman] pull it back after he hit that dirt?" He added, "If it hadn't been for him [Hylton], we would have made that curve." It was shown that he had previously testified in a criminal prosecution against Neauman for the death of Barbour that he did not think Neauman was driving recklessly in any way.

These were all the witnesses who testified and we agree with the trial court that their testimony was not sufficient to convict the defendant of gross negligence.

Gross negligence is that degree of negligence which shows an utter disregard of prudence, amounting to complete neglect of the safety of another, such as to be shocking to reasonable men. Whether it has been proved depends on the facts and circumstances in each case. If the evidence is such that reasonable men should not differ as to what is proved, the question is one of law for the court. *Finney* v. *Finney*, 203 Va. 530, 533, 125 S. E. 2d 191, 193; *Lloyd* v. *Green*, 194 Va. 948, 954, 76 S. E. 2d 190, 194; *Chappell* v. *White*, 182 Va. 625 29 S.E. 2d 858.

The testimony given by the plaintiff with respect to the facts and circumstances of the accident negatives the charge of gross negligence and shows he was not entitled to recover. *Crew* v. *Nelson*, 188 Va. 108, 49 S. E. 2d 326; *Virginia Elec., Etc., Co.*, v. *Mabin*, 203 Va. 490, 125 S. E. 2d 145. Considered alone or with the other evidence introduced by the plaintiff, it fails as a matter of law to make a case of gross negligence against the defendant. A verdict for the plaintiff based thereon could not stand and hence the action of the court in striking the evidence and entering summary judgment for the defendant Neauman was proper. Rules of Court 3:20.

The judgment appealed from is accordingly

*Affirmed.*