## Staunton

PAUL GAMBLE AND VIRGINIA TRANSIT COMPANY, INC. v. DOCK HILL, ADMINISTRATOR OF THE ESTATE OF FLORIDA C. HILL, DECEASED.

HAZEL VERNICE HALEY, ADMINISTRATRIX OF THE ESTATE OF JAMES P. HALEY, DECEASED v. DOCK HILL, ADMINISTRATOR OF THE ESTATE OF FLORIDA C. HILL, DECEASED, ET AL.

September 8, 1967.

Record Nos. 6477, 6478.

Present, All the Justices.

*Lawson Worrel, Jr. (J. Riley Johnson, Jr.; Ralph H. Ferrell, Jr.; Williams, Cocke, Worrel & Kelly; Hunton, Williams, Gay, Powell and Gibson,* on brief), for plaintiffs in error, Record No. 6477.

*Stanley E. Sacks (Sacks, Sacks & Kendall,* on brief), for defendant in error, Record No. 6477.

*E. Pryor Wormington (Rixey and Rixey,* on brief), for plaintiff in error, Record No. 6478.

*Stanley E. Sacks; Lawson Worrel, Jr. (J. Riley Johnson, Jr.; Ralph H. Ferrel, Jr.; Sacks, Sacks & Kendall; Williams, Cocke, Worrell & Kelly; Hunton, Williams, Gay, Powell and Gibson,* on briefs), for defendants in error, Record No. 6478.

EGGLESTON, C.J., delivered the opinion of the court.

On December 12, 1964, about 3:00 P. M., while a Virginia Transit Company bus operated by Paul Gamble was proceeding eastwardly along St. Julian Avenue and across Tidewater Drive, in the city of Norfolk, it was struck by an automobile driven by James P. Haley southwardly along Tidewater Drive. As the result of the collision Haley and two passengers in his car, including Florida C. Hill, aged sixteen, were killed. The other passenger, Carlton Conwell, survived. Florida C. Hill's administrator filed a motion for judgment against Gamble, Virginia Transit Company and the administratrix of Haley's estate to recover damages for the alleged wrongful death of the girl. The motion alleged that the collision and the death of the girl were proximately caused by the negligence of Gamble, the driver of the bus, and the gross negligence of Haley, the driver of the car.

There was a trial before a jury which resulted in a verdict and judgment of $20,000 in favor of the girl's administrator against all of the defendants. The defendants have appealed. They challenge the sufficiency of the evidence to sustain the verdict and judgment, the action of the trial court in excluding certain evidence offered by them, and its rulings on certain instructions.

At the scene of the collision Tidewater Drive is an arterial highway running approximately north and south and designed to carry two

lanes of travel in each direction, with a concrete island marking the center of the highway. The southbound lanes have a combined width of approximately 22 feet. The northbound lanes are approximately the same width. Between these latter northbound lanes and the median strip is a left-turn lane approximately 12 feet in width. On each side of the main highway is a feeder or access road approximately 20 feet wide.

St. Julian Avenue, which runs approximately east and west, is 30 feet wide. There is no traffic light at the intersection but there is a stop sign near the western edge of the western access feeder road, requiring an eastbound vehicle on St. Julian Avenue to stop before entering the access road and the intersection.

On Tidewater Drive, to the north of St. Julian Avenue, there is an underpass crossing under the Norfolk & Western Railway tracks. The center of the underpass at its lowest point is 900 feet from the extension of the northern line of St. Julian Avenue across Tidewater Drive. A vehicle in the lowest part of the underpass is not visible to the driver of a vehicle proceeding eastwardly along St. Julian Avenue and across the intersection. Tidewater Drive proceeds on an upgrade from the lowest point of the underpass until it reaches level pavement. After a vehicle has emerged from the underpass, proceeded along the upgrade and reached street level it is visible to the driver of a vehicle proceeding eastwardly along St. Julian Avenue and across the intersection. The record does not show the distance from the beginning of this street level to the center of the intersection or the stop sign. However, the witnesses refer to the distance as being that of one or two "city blocks" and the parties seem to agree that it is several hundred feet.

The posted speed limit at the intersection is 35 miles per hour. At the time of the accident a light rain was falling and the streets were wet.

J. Pierson Shaw, a witness called by the plaintiff, testified that just before the collision he was driving southwardly along Tidewater Drive in the right-hand lane; that as he reached the lowest point in the underpass he saw the Haley car "flash" by him in the left-hand lane, proceed along the upgrade leading from the underpass, and disappear over the "brow" of the hill; and that as his (Shaw's) car emerged from the underpass he saw the Haley car "skidding sideways and slammed right into the bus," pushing it sideways along the pavement. He could not say whether at the time of the impact the bus was moving. At the time of the collision, he said, the front of the

bus had passed the center of Tidewater Drive and was in the northbound lane. Shaw estimated the speed at which the Haley car passed his car at from 50 to 55 miles per hour.

An investigating police officer found the bus heading east on St. Julian Avenue, blocking the northbound feeder road and projecting into the "main portion of the northbound lane." He found the Haley car in the northbound left-hand lane. There were marks showing that the Haley car had skidded a distance of from 150 to 200 feet. The car had been demolished by the collision.

This officer testified that he interviewed Haley at the hospital before he died; that Haley was conscious, talked intelligently, and told him that just before the accident he was proceeding at 45 miles per hour. He further testified that he talked with Gamble, the driver of the bus, whose account of the accident was substantially as he (Gamble) later related at the trial.

Gamble, called as an adverse witness by the plaintiff, testified that his bus route carried him eastwardly along St. Julian Avenue and across Tidewater Drive; that in obedience to the stop sign he brought his bus to a complete stop before entering the intersection; and that he looked both ways and waited for the traffic to clear before attempting to cross. He saw no vehicle approaching from the underpass on his left. To the south, that is to his right, he saw northbound cars moving through a traffic light at Princess Anne Road, approximately two blocks away. Thus, seeing that traffic was clear he drove across the feeder road and southbound lanes on Tidewater Drive, looking in both directions as he did so. When the front of the bus reached approximately the center of Tidewater Drive he looked to his right, that is to the south, slowed down, and opened the right front door. At this time he saw on his right a northbound car driven by a woman about two car lengths away, and stopped the bus to allow her to pass in front of him. The bus remained stopped for a short period, which he estimated to be about twenty seconds, and just as he put his foot on the accelerator and began to move forward the bus was struck on the left side by the Haley car. He said that he never saw the Haley car before the impact.

Gamble further said that if the woman had come to an "easy stop" he "probably" could have crossed ahead of her, but was uncertain whether he could have done so. When asked by plaintiff's counsel, "[I]f you had seen that this car was coming up at a great speed toward the back of your bus which was blocking his [Haley's] road,

couldn't you have gone on across, and the lady might have had to stop, but you could have gone on across and avoided an accident, couldn't you?" his response was, "No. I couldn't. The bus doesn't move that fast. I couldn't move that fast."

Several passengers on the bus corroborated Gamble's account of the accident, the fact that he had come to a complete stop at the stop sign, and that the front of the bus was approximately in the center of Tidewater Drive when the impact occurred.

Carlton Conwell, the only surviving occupant of the Haley car, was called as a witness for the plaintiff. He testified that he was seated on the right-hand front seat of the car; that as the car proceeded through the underpass it was not "running fast," but was going 35, or 37, or "maybe 40," miles per hour; that when the car came up from the underpass and reached level ground he first saw the bus which was then crossing Tidewater Drive; that its front was extending across and blocking both southbound lanes of Tidewater Drive and its rear was in the feeder lane. He called out to Haley to watch out for the bus; that Haley replied, "Yes, I see it," applied his brakes, and the car "skidded around on the side and hit the bus."

[1] In finding their verdict in favor of the plaintiff administrator against Haley's administratrix the jury have obviously rejected the testimony of Conwell that just prior to the collision the Haley car was not proceeding at an excessive rate of speed. On the contrary, they have accepted the testimony of other witnesses that the Haley car sped through the underpass at an estimated speed of from 50 to 55 miles per hour, that after it emerged from the underpass it skidded sideways a distance of 150 to 200 feet into the side of the bus with sufficient force to push that vehicle sideways along the street, to be itself demolished, and cause the death of its driver and two of its occupants.

We think that the jury were amply justified in finding that Haley's driving in such a manner under these conditions was in utter disregard of prudence amounting to complete neglect of the safety of his passengers, such as to be shocking to reasonable men, and constituted gross negligence. See *Rigney* v. *Neauman*, 203 Va. 822, 826, 127 S. E. 2d 403, 406; *Fleming* v. *Bowman*, 203 Va. 876, 879, 128 S. E. 2d 290, 292, and cases there cited.

[2] We are further of opinion that the evidence shows that the gross negligence of Haley was the sole proximate cause of the collision and that Gamble, the bus driver, was not guilty of any negligence which was a proximate cause thereof.

The gist of the plaintiff's claim against Gamble and the Virginia Transit Company is that the jury were warranted in finding that Gamble failed to exercise a reasonable lookout as he proceeded into and through the intersection and that such failure was a proximate cause of the collision.

The plaintiff first says that Gamble's admitted failure to see the Haley vehicle warrants a finding that he was not exercising reasonable care to keep a proper lookout for this vehicle after it had emerged from the underpass. The basis of this contention is the testimony of Conwell, the surviving occupant of the Haley car, that when that vehicle emerged from the underpass and reached the street level the bus was crossing Tidewater Drive with its front extending across and blocking both southbound lanes and its rear extending into the feeder lane. It is argued that if in this situation the bus was plainly visible to an occupant of the Haley car, the latter vehicle was in plain view of the bus driver had he looked in its direction.

It is true that we have frequently said that a motorist approaching an intersection is under the duty to see another vehicle which is in plain view and is guilty of negligence if he fails to do so. *Perry v. Thompson*, 196 Va. 817, 820, 86 S. E. 2d 35, 37; *Oliver v. Forsyth*, 190 Va. 710, 716, 58 S. E. 2d 49, 51; *Yellow Cab Co. v. Eden*, 178 Va. 325, 341, 16 S. E. 2d 625, 631.

It is undisputed that until the Haley car had emerged from the underpass it was not visible to Gamble. We may assume that the jury were warranted in finding that in the exercise of ordinary care Gamble should have seen the other vehicle after it had emerged from the underpass and before the impact occurred. But even so, it is clear that his failure to do so was not a proximate cause of the collision. There is no showing that in this situation there was anything that Gamble could then have done to prevent the car from skidding into the side of the bus. Obviously, there was not.

The plaintiff next says that the jury were warranted in finding that Gamble was negligent when, according to his own testimony, he brought the bus to a stop near the center of the highway in order to permit the passage of the northbound vehicle; that the bus remained standing for approximately twenty seconds during which time he did not look to the left, the direction from which the Haley car came. Clearly, we think the bus driver was not negligent in yielding the right of way to the other vehicle, which was only two or three car lengths to his right. Moreover, as has been said, Gamble testified

that if he had not yielded the right of way to this other vehicle and had attempted to pass in front of it, the collision with the rapidly approaching Haley car would not have been averted. There is no evidence to the contrary. Gamble explained his failure to look to the left while his bus was temporarily halted by saying that at that time his attention was being directed to traffic on his right. But, in any event, his failure to do so at that time in no manner caused or contributed to the collision.

On the whole our conclusion is that the evidence is insufficient to support a finding that the driver of the bus was guilty of any negligence which was a proximate cause of the collision and the death of the plaintiff's intestate. Consequently, the judgment in favor of the plaintiff administrator against the driver of the bus and the Virginia Transit Company will be reversed, the verdict in favor of the plaintiff administrator against these two defendants set aside, and final judgment here entered in their favor.

[3] In the absence of the jury the defendants showed on the cross-examination of Dock Hill, the father of the decedent and the administrator of her estate, that at the time of her death she was sixteen years of age, had never been married, was the mother of a three-year-old child born out of wedlock and was again pregnant, and that she and her illegitimate child were living with and supported by her parents. The defendants requested that they be permitted to develop this evidence before the jury in mitigation of the damages they might award to the parents and members of the family of the girl for the loss of her society and by way of comfort to them for the sorrow, suffering and mental anguish occasioned by her death. This request was denied and that ruling is attacked on this appeal by Haley's administratrix.

In *Basham* v. *Terry, Adm'x*, 199 Va. 817, 102 S. E. 2d 285, we held that in an action for wrongful death where members of decedent's family testified as to his sobriety, habits, conduct and happy relations with his family, the defendant was entitled to cross-examine such witnesses and show, in mitigation of damages, the decedent's bad habits and his unhappy relationship with his family. 199 Va. at 824, 825, 102 S. E. 2d at 290, 291.

The trial court properly held that that case is not controlling here, because in the present case the plaintiff offered no evidence of the good character of the decedent girl to enhance the damages to which the members of her family were entitled because of her death.

In an action for wrongful death, on the issue of damages, evidence of the character and habits of the decedent is frequently admissible. 25A C. J. S. Death § 122, p. 1014 *ff.*; 22 Am. Jur. 2d, Death § 144, p. 709 *ff.* This is particularly so where pecuniary loss to the beneficiaries of a decedent is in issue. *Norfolk & Western Ry. Co.* v. *Lumpkins, Adm'x,* 151 Va. 173, 191, 192, 144 S. E. 485. However, in the present case there was no claim that the decedent's death occasioned any pecuniary loss to her parents or the other members of her family. Hence, the question presented is whether the evidence offered by the defendants of this young girl's moral delinquencies was relevant on the amount of damages which the jury might award to her parents and other members of her family for the loss of her society and for the sorrow, suffering and mental anguish occasioned to them by her death. The precise question has not been previously presented to us and there is a conflict of authority in other jurisdictions.

In *Smith* v. *King* (1951), Ky., 239 S. W. 2d 955, 958, an action for the wrongful death of a six-year-old boy, it was said that the health, mental capacity and the nature of this child were proper subjects to present to the jury, because they were entitled to know some of his personal attributes before they assessed damages for the taking of his life.

In *Wimberly* v. *City of Paterson* (1962), 75 N. J. Super. 584, 183 A. 2d 691, it was held that evidence of moral characteristics of a deceased juvenile offender, his commitment to a state home for boys, and particular bad acts or offenses on his part was admissible.

In *Hill* v. *Erie R. Co.* (1928), 225 App. Div. 19, 232 N. Y. S. 66, it was held that there was no reversible error in excluding court records adjudging a deceased boy guilty of juvenile delinquency. But in the later case of *Russell* v. *Cirillo* (1962), 17 App. Div. 2d 1005, 234 N. Y. S. 2d 67, such evidence was held to be admissible. .

In *Anthony* v. *New York Central R. R. Co.* (1965), 61 Ill. App. 2d 466, 209 N. E. 2d 686, it was held that the court properly excluded evidence of deceased's misbehavior and juvenile commitment. These and other cases collected in the annotation in 99 A. L. R. 2d 972, throw little light on just why such evidence should be admitted or excluded.

In the case before us, since there was no claim of pecuniary loss occasioned by the death of this girl, Instruction No. 12,[1] in the usual

---

[1] "If from the evidence and the other instructions of the court you find your verdict in favor of the plaintiff, the administrator of the Estate of Florida Hill, deceased, you may award such damages as to you may seem fair and just, not to exceed the

form, told the jury that in awarding damages if any to the plaintiff administrator they might take into consideration compensation "for loss of the decedent's society" to her parents, brother and sisters, and "such further sum" as they might deem fair and just "by way of solace and comfort" to these members of her family "for the sorrow, suffering and mental anguish occasioned to each of them by her death."

We agree with the trial court that the evidence tendered by the defendants was not relevant on the elements of damages submitted to the jury by this instruction. The gist of the tendered evidence showed that this girl had been guilty of immoral conduct and illicit relations, was the mother of one illegitimate child and was about to become the mother of another. The proffered evidence did not show or tend to show that because of her immoral conduct her parents and the other members of her family lacked affection for her or that her death brought no sorrow, suffering or mental anguish to them. Indeed, the fact that the parents allowed this daughter to remain at home where they cared for and supported her and her illegitimate child is evidence of their affection for her. It is a matter of common knowledge that despite such moral delinquencies the parents of a wayward child may have a deep affection for it. If authority for this position be needed, it is found in the parable of the Prodigal Son.

The evidence was objectionable for the further reason that it would tend to divert the attention of the jury from the main issue before them—the question of what damages they should award to the parents and other members of the family of this girl—and tend to induce the jury to equate a just award to them with her moral delinquencies.

Haley's administratrix assigns error to the granting of Instruction 12, *supra*, on the ground that there was no evidence that the surviving beneficiaries of the decedent suffered any loss of society or were caused any sorrow, suffering or mental anguish as the result of her death. While there was no direct evidence on such elements of dam-

sum of Thirty-five Thousand ($35,000) Dollars, and in assessing the damages you may ascertain the same with reference to the following:

"1. Compensation for loss of the decedent's society to her mother and father, Lillian and Dock Hill, and her brother and sisters.

"2. Such further sum as you may deem fair and just by way of solace and comfort to her mother and father, Lillian and Dock Hill, and her brother and sisters, for the sorrow, suffering and mental anguish occasioned to each of them by her death.

"And the jury shall make an allocation of the sum awarded as it deems proper between the mother and father and brother and sisters of Florida Hill, deceased."

ages, none was required. In *Southern Bell Telephone & Telegraph Co. v. Clements*, 98 Va. 1, 6, 34 S. E. 951, we held that a jury may infer mental anguish from serious bodily harm, causing great physical pain and suffering, without other proof on the subject. See also, 25A C. J. S. Damages § 162(7), p. 99; 22 Am. Jur. 2d, Damages § 299, p. 399. Similarly, we think, in the present case the jury had the right to infer that the death of this young girl may have brought sorrow, suffering and mental anguish to her parents and the other members of her family, although there was no direct proof thereof. See 22 Am. Jur. 2d, Death § 246, p. 780.

The defendant administratrix also argues that if the jury had the right to infer that the death of this girl may have brought sorrow, suffering and mental anguish to her parents and other members of her family, the administratrix was entitled to offer evidence in rebuttal of such inference and that the evidence which was tendered and rejected by the trial court was designed for this purpose and had this effect. We agree that the granting of Instruction 12, *supra*, at the request of the plaintiff, entitled the defendant administratrix to offer proper and relevant evidence in rebuttal. But as has been pointed out, the evidence which was tendered fell short of proving or tending to prove that the decedent's beneficiaries had suffered no sorrow or mental anguish by reason of her death.

[4] The dissent says that, "The prejudicial effect of barring from the jury the evidence of the decedent's immoral character is exemplified" by a detailed portion of the closing argument of the plaintiff's counsel which is characterized as "absurd" and should not be approved.

Since there was no evidence to support the implication that the decedent was "sweet sixteen" and innocent of wrongdoing, the argument was improper and upon timely objection the lower court would no doubt have so ruled. But the record shows that no such objection was made, nor is the propriety of the argument raised in the assignments of error. Consequently, the prejudicial effect, if any, of such argument will not be considered on appeal. Rule 1:8; *Id.*, 5:1, § 4.

The further assignments of error by Haley's administratrix have been sufficiently dealt with in what has been said. The judgment in favor of the plaintiff administrator against that defendant is affirmed.

*Affirmed in part; reversed in part, and final judgment.*

CARRICO, J., dissenting in part.

I agree with the majority that the judgment against Virginia Transit and Gamble should be reversed for the reasons assigned in the majority opinion. But I would also reverse the judgment against the administratrix of Haley's estate and order a new trial because, in my view, the evidence relative to the immoral character of the decedent was clearly admissible.

The majority apparently holds that, as a matter of law, a girl who at age thirteen gives birth to an illegitimate child and at age sixteen is again illicitly pregnant affords the same society to her family as a child of good character and habits. The majority further holds, in effect, that the death of such an immoral girl causes just as much sorrow, suffering, and mental anguish to her family as the loss of a normally moral and well-behaved child.

The fallacy of the position of the majority is found in this sentence of the opinion: "It is a matter of common knowledge that despite such moral delinquencies the parents of a wayward child *may* have a deep affection for it." [Emphasis added.] That statement must, of course, be taken as true because anything *may* happen in the realm of human relationships. But the effect of the majority decision is to say that the parents of a wayward child *do* have deep affection for it, in every instance. That cannot be said because it is also common knowledge that often the immoral acts of a wayward child turn its parents' feelings toward it from love to hate.

The very statement that parents of a wayward child *may* have deep affection for it, despite its moral delinquencies, is recognition of the fact that such affection *may not* exist at all because of its wanton behavior. In any event, such a situation in a wrongful death case presents a typical jury question where the trier of fact should be permitted to determine what, in view of the child's waywardness, was the true relationship between the child and its family.

The prejudicial effect of barring from the jury the evidence of the decedent's immoral character is exemplified by the closing argument of the plaintiff's counsel. With such evidence excluded, he was free to say to the jury, and the defendants were powerless to reply, that:

"... Life is dear to all of us. An elderly person is just as important and just as valuable to all of us as a younger person, but in the scale of it, if someone hasn't even reached the prime of

their life, a sixteen-year-old girl, isn't that life worth more in dollars and cents, if you have to compare, than perhaps somebody who is in the sunset years of their life, who's lived and enjoyed and been with their family for that length of time? But the point I make and suggest to you respectfully, that a sixteen-year-old girl —and in suggesting to you, I think of the American expression 'sweet sixteen.' I am not suggesting, I am just saying that is an epitome of youth, sweet sixteen."

A sixteen-year-old girl—the mother of one illegitimate child and the bearer of another product of an illicit relationship—"sweet sixteen"? We should adopt no rule of evidence which would permit such an absurd argument to be made.

Since the foregoing was written, the majority opinion has been changed to take note of this dissent. The majority now says that the closing argument of the plaintiff's counsel was improper, but holds that it will not consider the prejudicial effect, if any, of such argument because no objection was made thereto in the trial court and no assignment of error relates thereto in this court.

The majority misses the point. I have not said, nor have I implied, that the trial court erred, in any manner, with respect to the closing argument of the plaintiff's counsel. My dissent is directed solely to the error of the court in excluding from the jury the evidence of the immoral character of the decedent. And I say that the original error in excluding such evidence was prejudicial because it permitted the plaintiff's counsel to argue as he did. Thus, the error and the prejudice resulting therefrom may be reached and considered despite the lack of objection to the argument.

I do not agree with the majority where it states, in its changed opinion, that the argument of the plaintiff's counsel "was improper and upon timely objection the lower court would no doubt have so ruled." Once the evidence of the decedent's immoral character was excluded from the jury, I think the plaintiff's counsel was free to present his argument to the jury, however absurd such argument might, in reality, have been, leaving the defendants without proper objection thereto and with no basis for reply.

This brings me to complete disagreement with the majority's reason for holding improper the argument of the plaintiff's counsel. That reason is because "there was no evidence to support the implication that the decedent was 'sweet sixteen' and innocent of wrong-

doing." In assigning that reason for its holding, the majority, it seems to me, has not only adopted an erroneous rule but also has taken inconsistent positions in its opinion.

In discussing the defendant's objection to the granting of Instruction 12, relating to the measure of damages, the majority holds that no direct evidence was required to show that the surviving beneficiaries of the decedent suffered loss of society and were caused sorrow, suffering, and mental anguish as the result of her death. Such loss of society and such sorrow, suffering, and mental anguish may, the majority says, be inferred from the fact of the death of the child. With that I agree. But now the majority holds, in its changed opinion, that it was improper for the plaintiff's counsel to argue to the jury as he did because there was no evidence to support the implication that the deceased child was innocent of wrongdoing.

The implication that the child was innocent of wrongdoing is entitled to the same dignity as the inference that her death caused loss of society and sorrow, suffering, and mental anguish to her surviving beneficiaries. Yet the majority holds that the inference needs no evidence to support it, while the implication must have evidence behind it before it may be the subject of comment.

I have always considered that a child is presumed to be innocent of wrongdoing. Hence, I think there is no burden upon the plaintiff in an action for the wrongful death of a child to prove the child's innocence from wrongdoing as a prerequisite to the right to comment thereon in argument before the jury.

I would hold, then, that the plaintiff in an action for the wrongful death of a child is entitled to the inference that such death causes loss of society and sorrow, suffering, and mental anguish to the surviving beneficiaries. I would also hold that such a plaintiff is entitled to the presumption that the child was innocent of wrongdoing. But against that inference and that presumption, the defendant should be permitted to introduce evidence of the immoral character of the child. And I would leave it to the jury to say whether, in view of such evidence, the parents *may* or *may not* have had deep affection for the child and *may* or *may not* have suffered the same loss as if the child had been, in fact, "sweet sixteen."

SNEAD and GORDON, JJ., join in this dissent.