**SHORE EXPLORATION AND PRODUCTION CORP.,**
Plaintiff,

v.

**EXXON CORP., Texaco, Inc., and Eastern Exploration, Inc.,**
Defendants.

**No. CA 3–95–CV–1228–R.**

United States District Court,
N.D. Texas,
Dallas Division.

July 16, 1997.

See also 976 F.Supp. 511.

Robert J. Clary, Jamie King Harrison, Owens Clary & Aiken, Dallas, TX, for Shore Exploration and Production Corp.

Jay Scott Carothers, Exxon Corp., Houston, TX, for Exxon Corp.

William T. Hankinson, Jane Politz Brandt, Anna E. Marple, Thompson & Knight, Dallas, TX, Jeffrey K. Smith, Texaco Inc., New Orleans, LA, Michael Warren Perrin, King & Spalding, Houston, TX, for Texaco Inc.

Scott Charles Krist, Krist Gunn Weller Neumann & Morrison, Houston, TX, Stanley Jack Krist, Stanley J. Krist & Associates, Houston, TX, Joel Howard Muscat, Law Office of Joe Muscat, Stafford, TX, for Eastern Exploration Inc.

Maxel B 'Bud' Silverberg, Law Office of Maxel 'Bud' Silverberg, Dallas, TX, pro se.

Douglas Steward Lang, Gardere & Wynne, Dallas, TX, for Juliet Challenger Inc.

## *MEMORANDUM OPINION*

BUCHMEYER, Chief Judge.

This oil and gas case involves a dispute about leasehold interests lost. In simple terms, Shore assigned oil and gas leasehold interests to Defendants (Exxon, Texaco, and Eastern) in which it retained a royalty interest. Each of the leases changed hands, all ultimately ending up in the hands of Eastern. The leases were lost when the Eastern failed to pay the delay rentals.[1] Shore claims that had it received notice that the delay rentals would not be paid on the leased property, it could have exercised its rights to pay the delay rentals itself and to take reassignment of the leases.

---

1. In the oil and gas industry, it is standard practice for the lessor of an oil and gas lease to include a provision for payment of "delay rentals" in the lease. The provision typically recites that the lessee will either commence development of the leasehold by a certain date or pay some fixed annual amount to the lessor to maintain the lease in effect. In most instances, if the lessee fails to make timely payment of the delay rental, the lease terminates automatically. The purpose of the clause is to provide the lessor with some assurance that it will receive income off the property even if the property is not being developed.

 Williams and Meyers, OIL AND GAS LAW, § 403, et seq. (Matthew Bender 1995).

This opinion holds that Texaco is liable to Shore for the loss of the leases that Shore assigned to Exxon and to Texaco, but that Texaco is not liable for the loss of the leases assigned to Eastern by Shore.

## I. THE FACTUAL BACKGROUND

In the 1980's, Shore acquired working interests in numerous oil and gas leases in Virginia's Taylorsville Basin, located in Caroline, King and Queen, and Essex counties. Between 1983 and 1990, Shore agreed to assign interests in those leases and later-acquired leases to Exxon, Eastern, and Texaco in three separate transactions. Specifically:

### a. The Texaco Leases

In December of 1983, Shore assigned to Texaco a 75 percent interest in the Taylorsville Basin leases. The parties do not contest that these leases became subject to a gross negligence notice provision contained in the subsequent December 20, 1984 Agreement which terminated a joint venture and governed the parties' rights and obligations under the leases within the former Area of Mutual Interest ("AMI").[2] Under the Shore/Texaco Agreement's gross negligence notice provision, Texaco was required to pay delay rentals or to give notice of its intent to not pay the rentals. However, Texaco's liability for failure to give notice would be limited to gross negligence or willful misconduct.

By February 1990, Texaco had acquired a 100 percent interest in the Texaco leases and the Exxon leases.

---

2. The contract provides that: "all rights and obligations between Shore and Texaco concerning any lease, present or future, within the former Area of Mutual Interest or any overriding royalty payable to Shore shall be governed solely by the terms and conditions of this agreement." (The former AMI refers to the counties of King and Queen, Caroline, Hanover, King William, Westmoreland and Essex Counties, Virginia.) The Shore/Texaco Agreement also had a gross negligence notice provision which reads as follows: "Texaco shall have no liability to Shore for failure to offer any lease(s) to Shore, provided such failure is not the result of gross negligence or willful misconduct."

## b. The Exxon Leases

In December of 1984, Shore assigned to Exxon certain of its leases, located within Caroline, Essex, and King and Queen counties, subject to Shore's reservation of a ten-year overriding royalty interest. Under this agreement (the "Exxon Agreement"), Exxon was required to pay delay rentals or, in the alternative, to notify Shore of its intent not to do so, thereby giving Shore the opportunity to pay the rental on these leases (the "Exxon Leases"). This agreement did not contain an exculpatory clause limiting Exxon's liability to gross negligence or willful misconduct. In April 1985, Exxon transferred a 50 percent interest in the Exxon Leases to Texaco under a Texaco/Exxon joint venture. Then, in February 1990, Texaco acquired all of Exxon's right, title and interest in all these leases. The Exxon Leases remained subject to the Exxon Agreement and its general notice provision.

On January 1, 1993, the Exxon Leases were re-leased to Eastern. The leases were held by Eastern at the time of the foreclosure.

## c. Eastern Leases and Eastern A.P. Hill Leases

In October 1989, Shore assigned to Eastern leases in the AMI [3] (in Caroline and Essex counties) and within the Camp A.P. Hill Military Reservation subject to Shore's royalty interest. In July 1990, Texaco acquired these leasehold interests from Eastern, still subject to the overriding royalty interest maintained by Shore. This agreement also incorporated a general notice provision, nearly identical to that contained in the Exxon lease agreement. As of January 1, 1993, Texaco was no longer in possession or control of these leasehold interests, as it had assigned Eastern 100 percent of its interest in the former AMI.

## d. Forfeiture

Each of the leases discussed above was forfeited because the delay rentals were never paid.

### Pending Motions

Now before this Court is Defendant Texaco's Motion for Summary Judgment. For the reasons stated below, the Motion is **GRANTED IN PART** and **DENIED IN PART**. Also before the Court is Plaintiff Shore's Cross–Motion for Partial Summary Judgment. For the reasons stated below, Plaintiff's Motion is **GRANTED IN PART** and **DENIED IN PART**.

## II. APPLICABLE LAW

Rule 56(c) of the Federal Rules of Civil Procedure allows summary judgment only where there is no genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law.[4] All reasonable doubts and inferences must be decided in the light most favorable to the party opposing the motion.[5] Indeed, as long as there appears to be some evidentiary support for the disputed allegations, the motion must be denied.[6]

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact.[7] Where the non-moving party bears the burden of proof on a claim upon which summary judgment is sought, the moving party may discharge its summary judgment burden by showing that

---

**3.** The AMI was created by an exploration agreement which provided for joint drilling and cost sharing. Texaco and Eastern Virginia Gas Company Joint Venture ("EVGJV")—a joint venture between Eastern and Emerald Refining Co.—each assigned each other an undivided 50 percent interest in the leases. This agreement was subsequently terminated, and thus the leases in the area came to be known as the "former AMI."

**4.** Fed.R.Civ.P. 56(c) (1994).

**5.** *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 640 (5th Cir.1985).

**6.** *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Coke v. Gen. Adjustments Bureau*, 640 F.2d 584, 595 (5th Cir.1981 (en banc)).

**7.** *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

there is an absence of evidence to support the nonmoving party's case.[8] Once the moving party has satisfied its burden, the nonmoving party must go beyond the pleadings and—by its own affidavits or by depositions, answers to interrogatories, and admissions on file—set forth specific facts showing a genuine issue for trial.[9] Summary judgment will be granted against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[10]

## III. THE LEGAL ANALYSIS

Texaco moves for summary judgment on the basis that Texaco had no duty to provide Shore with notice that delay rentals would not be paid on the leases Texaco acquired from Exxon and Eastern. Texaco argues that because there is no contractual privity between it and Shore for the Exxon leases, there is no notice obligation binding on Texaco for Eastern's failure to pay delay rentals or notify Shore. Shore cross moves for summary judgment on the basis that Texaco is contractually liable to Shore for the forfeiture of the Eastern A.P. Hill leases and the Exxon leases caused by Texaco's failure to notify Shore that delay rentals had not been paid.

### Privity of Contract

The question of privity is a crucial one in determining Texaco's liability because Texaco no longer owned an interest at the time the leases were forfeited, having transferred its interest to Eastern on January 1, 1993. The failure to give notice took place after this transfer became effective on May 1, 1992.

 Privity of contract exists only if the party benefitted by a covenant and the assignee actually enter into a contract or lease

containing the covenant. If there is contractual privity, then the assignee's contractual duty is not relieved when the assignee later assigns the lease to a third party even when the lessor consents to the assignment.[11] Rather, the assignee continues to be "liable on his covenant by virtue of the privity of contract."[12] Therefore, if Texaco and Shore were in privity of contract, then Texaco would be liable for the failure of Eastern, the subsequent assignee, to provide Shore with notice.

### Texaco Leases

 The parties do not dispute that the leases assigned from Shore to Texaco are governed by the December 20, 1984 Agreement. This Agreement was entered into by Texaco and Shore, creating contractual privity between them. In it, the parties agreed that Texaco would be contractually liable under the gross negligence notice provision. Thus, Texaco continued to be obligated under this provision to pay delay rentals on the Texaco Leases or to notify Shore of its intent not to do so, even after the leases were subsequently assigned to Eastern.

### Exxon Leases

 There is also contractual privity between Shore and Texaco with respect to the Exxon Leases. The Exxon Leases were originally assigned from Shore to Exxon pursuant to the Exxon Agreement which contained a general notice provision. The terms and conditions of the Exxon Agreement, including the general notice provision, were expressly incorporated into an agreement entered into by Shore and Texaco in May 1992 ("1992 Shore/Texaco Agreement"), memorializing Shore's overriding royalty interests in the Exxon Leases.[13] Therefore, Texaco and

---

**8.** *Id.* at 325, 106 S.Ct. at 2553–54.

**9.** *Id.* at 324, 106 S.Ct. at 2553; *Anderson v. Liberty Lobby Inc.*, 477 U.S. at 256, 106 S.Ct. at 2514.

**10.** *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

**11.** *Cavalier Square Ltd. Partnership v. Virginia Alcoholic Beverage Control Bd.*, 246 Va. 227, 435 S.E.2d 392, 395 (1993).

**12.** *Powell v. John E. Hughes Orphanage*, 148 Va. 331, 138 S.E. 637, 646 (1927).

**13.** The relevant portion of the 1992 Shore/Texaco Agreement reads as follows:

The parties hereto agree that this assignment is specifically made subject to that certain executed but unrecorded Agreement, dated December 20, 1984, between Shore Exploration and Production Corporation and Exxon Corporation, and is also specifically made subject to

Shore are in direct privity of contract with respect to the Exxon Leases' general notice provision and Texaco had a contractual duty to notify Shore in the event delay rentals were not paid.

## Eastern Leases

The Eastern Leases were originally assigned by Shore to Eastern, subject to an agreement incorporating a general notice provision. In July 1990, Eastern assigned its leasehold interests in the former AMI to the EVGJV and Texaco joint venture. Because Texaco was not a party to the original Shore/Eastern Agreement, there is no privity of contract between Shore and Texaco. Therefore, Shore cannot enforce its terms against Texaco unless it can establish privity of estate or it can show this Court some agreement wherein Texaco bound itself contractually to these terms.

█ Shore contends that the December 20, 1984 Shore/Texaco Agreement created contractual privity between Shore and Texaco with respect to the Eastern Leases because of the following clause: "all rights and obligations between Shore and Texaco concerning any lease, *present or future*, within the former Area of Mutual Interest or any overriding royalty payable to Shore shall be governed solely by the terms and conditions of this agreement." (emphasis added). Shore relies on this clause as evidence of the parties' intent that the gross negligence notice provision of the December 1984 Shore/Texaco Agreement should control all subsequent leasehold interests acquired by Texaco in the former AMI, including those leases assigned to Texaco by Eastern in July 1990.

█ The Court is unpersuaded by Shore's interpretation of this clause. A contract must be interpreted as a whole to determine the parties' intent with respect to specific provisions.[14] When read within the context of the entire agreement this clause cannot be understood to express an intent to effectively trump any future agreement entered into by other parties governing leases in the former AMI. This clause is within a paragraph which serves to terminate an earlier agreement between the same parties governing the same lease assignment. Rather than serving as the last word regarding Texaco's and Shore's contractual obligations and duties, this clause merely clarifies that this agreement's terms now govern, and not the terms from the 1984 agreement. Moreover, the notice provision of the December 1984 Agreement does not expressly apply to later-acquired leases, but only addresses leases in which "Shore has only an overriding royalty interest." The use of the present tense and the failure to specify its application to future leases makes it obvious that the gross negligence notice provision was not intended to apply to every lease into which Shore and Texaco thereafter entered.

There being no other agreement between Shore and Texaco affecting the Eastern leases, this Court must conclude that there is no contractual privity between Shore and Texaco regarding the Eastern leases. Thus, in order to hold Texaco liable for the failure to give notice, Shore either must show that the obligation was a covenant running with the land and that Texaco and Shore are in privity of estate, or that the notice provision was a personal covenant, enforceable against each

that certain executed but unrecorded Agreement, dated December 29, 1984, between Shore Exploration and Production Corporation and Texaco Inc., the terms and provisions of said Agreements being incorporated herein by reference for all purposes and as fully as if set forth herein.

Texaco argues that to interpret this paragraph as incorporating the notice provisions of both the Texaco Agreement and the Exxon Agreement would create an inconsistency and thus should not be read as such. The Texaco Agreement contained an exculpatory provision, while the Exxon Agreement did not. However, the Court, after an examination of the entire contract, finds

that there is only one interpretation that would give effect to the parties' intent. By incorporating the terms of both the Texaco Agreement and the Exxon Agreement, the parties must have intended that each agreement would continue to govern the leases assigned by it. In other words, leases originally assigned to Exxon would continue to be subject to the Exxon Agreement terms, while leases originally assigned to Texaco would be subject to the Texaco Agreement terms.

14. *Brooks v. Bankson*, 248 Va. 197, 445 S.E.2d 473, 477 (1994).

assignee who took the lease with notice of the personal covenant.[15]

*Covenant Running with the Land*

■ At issue here is the covenant to provide notice in the original agreement between Shore and Eastern (the Shore/Eastern Agreement) by which the Eastern leases were assigned. In deciding whether the covenant runs with the land or if it is a personal covenant,[16] Virginia courts look for the following three conditions: (1) the parties to the covenant intended that it would run with the land; (2) the parties to the covenant were in privity of estate at the time they entered into the covenant; and (3) the covenant touches or concerns the land.[17]

■ First, the parties expressed their intention that the covenants would run with the land on the face of each assigning document. In ascertaining the intention of the parties, the Court examines not only the words used in phrasing the covenant, but also the entire instrument. The relevant portion of the assignment of the Eastern leases from Shore to Eastern reads as follows: "Assignee for itself, its successors and assigns, by acceptance of the benefits hereof shall be obligated to duly perform each and every provision of the said leases including payment of royalties thereunder. In the event that Assignee, its successors or assigns elects not to pay delay rentals with respect to any leases hereby assigned, notice of such election shall be delivered to Assignor . . . ." This language suggests that the parties intended the notice obligation to be a covenant running with the land.[18]

■ Second, the parties were in privity of estate at the time they entered into the covenant. Parties are in privity of estate if they have a mutual or successive relationship to the same rights in property.[19] Because the lease was assigned from Shore to Eastern, the parties were in privity of estate.

■ Third, the notice provision and obligation to pay delay rentals touches and concerns the leasehold interest. Almost all covenants imposing an affirmative duty on the covenantee in a transfer of oil and gas interests are presumed to run with the land.[20] For example, "covenants to pay rents and royalties, furnish free gas, to test and develop the land, protect it from drainage, market the oil or gas produced are all covenants which so affect the nature of the legal interests of the lessor and the lease, . . . so that the benefit or burden thereof may run with an assignment of the lease . . . and are not purely collateral or personal." [21] This Court has no trouble concluding that similar status should be granted to a covenant requiring that delay rentals be paid or notice given. Having met all three requirements, the notice provision is a real covenant which runs with the land.

■ The burden of a covenant running with the land runs to an assignee of a lease only if that assignee is in privity—either privity of contract or privity of estate—with the party benefitted by the covenant.[22] As concluded above, Texaco and Shore were never in contractual privity with regards to the Eastern lease gross negligence notice provision or the Eastern A.P. Hill general notice provision. Parties are in privity of estate if they have a mutual or successive relationship to the same rights in property.[23] Privity of estate exists by virtue of an assign-

---

**15.** *See Carneal v. Kendig,* 196 Va. 605, 85 S.E.2d 235 (1955).

**16.** A personal covenant binds all subsequent assignees who take the assignment with notice of the covenant. Rather than "running with the land," the covenant passes from assignor to assignee and is thus "personal."
 *Id.* 85 S.E.2d at 238–39.

**17.** *Net Realty Holding Trust v. Franconia Properties, Inc.,* 544 F.Supp. 759, 762 (E.D.Va.1982).

**18.** *See Net Realty Holding Trust,* 544 F.Supp. at 762–63.

**19.** BLACK'S LAW DICTIONARY 1199 (6th Ed.1990).

**20.** 3 W.L. Summers, THE LAW OF OIL AND GAS § 553 (1958).

**21.** *Id.*

**22.** *Old Dominion Iron & Steel Corp. v. Virginia Elec. & Power Co.,* 215 Va. 658, 212 S.E.2d 715, 722, n. 5 (1975).

**23.** BLACK'S LAW DICTIONARY 1199 (6th Ed.1990).

ment of an oil-and-gas lease.[24] Texaco and Shore were in privity of estate once Eastern assigned its interest in these leases to Texaco.[25]

However, privity of estate only exists as long as the assignee maintains an actual interest in the leasehold estate.[26] Thus, if an assignee transfers his entire estate to a third party, then the privity of estate is extinguished between the party benefitted by the covenant and the assignee.[27] However, if the assignee retains any control over the interest assigned then the transfer is a sublease and rot a true assignment, and the assignee is consequently still liable under the covenant.[28] The parties do not dispute that the transfer of the Eastern leases from Texaco back to Eastern by the agreement dated January 1, 1993, was a true assignment. A true assignment operates to transfer all the rights and obligations once held by the assignor to the assignee.[29] In other words, the assignee assumes all obligations running with the land, while the assignor—if not in privity of contract with the original owner—is relieved of liability.

After the assignment of the Eastern leases and Eastern A.P. Hill leases from Texaco back to Eastern, Texaco and Shore were no longer in privity of estate because Texaco did not retain an interest in the leases. There being no privity of contract or privity of estate between Texaco and Shore, Shore has no basis to hold Texaco liable for Eastern's subsequent breach of the notice provision, a covenant running with the land.

*Liability for Failure to Notify*

*Texaco Leases and the Gross Negligence Notice Provision*

As concluded above, Texaco remained contractually liable to Shore under the Texaco lease agreement's gross negligence notice provision even after it conveyed its interests

in the leases to Eastern. This provision reads as follows:

Should Texaco elect not to pay delay rentals on lease(s) located within the boundaries of the former Area of Mutual Interest in which Shore has only an overriding royalty interest, Texaco shall first notify any party who owns a working interest in such lease or leases of its intention to surrender said lease or leases by nonpayment of delay rentals. If the other working interest owner(s) elect not to pay the delay rental(s), Texaco shall then advise Shore of its intent to release such lease(s) and Shore shall have the right to make such payment(s) and Texaco shall assign its interest in said lease(s) to Shore. Texaco shall give Shore thirty (30) days advance notice of its intention not to make such delay rentals. Shore shall advise Texaco whether it wishes to make said delay rental payments within fifteen (15) days of receipt of notice. Failure to timely respond shall be considered an election by Shore not to make such payment(s). *Texaco shall have no liability to Shore for failure to offer any lease(s) to Shore, provided such failure is not the result of gross negligence or willful misconduct.* Texaco agrees that it will furnish Shore each month with copies of rental receipts as proof of rental payments being made on lease(s) during the preceding month. (emphasis supplied).

The provision is structured so that Texaco's liability for failing to timely "offer" leases to Shore should be judged under the gross negligence/willful misconduct standard. This provision does not however create a duty to *make* delay rental payments, nor does it provide a standard for Texaco's failure to do so. Rather, the provision only addresses Texaco's liability in the event that it decides not to make delay rental payments *and then fails to notify*, or "offer," Shore the leases.

**24.** *See, e.g., Westland Oil Dev. Corp. v. Gulf Oil Corporation,* 637 S.W.2d 903, 911.

**25.** Actually, the leases were assigned to the joint venture formed by Texaco and EVGJV.

**26.** *Old Dominion Iron & Steel Corp,* 212 S.E.2d at 722, n. 5.

**27.** *Powell,* 138 S.E. at 646.

**28.** *S.L. Nusbaum & Co. v. Atlantic Virginia Realty Corp.,* 206 Va. 673, 146 S.E.2d 205, 210 (1966).

**29.** *du Pont de-Bie v. Vredenburgh,* 490 F.2d 1057, 1061 (4th Cir.1974).

525525

Therefore, the Court shall focus its attention on Texaco's attempts (or lack thereof) in making sure that Shore was notified once Texaco understood that delay rentals would not be paid.

Texaco argues that by virtue of two letters written by its employee Anthony J. Bodine (the "Bodine Letters"), Shore agreed to release Texaco from the notice obligation. An assignor, unless expressly released, remains liable on the terms of the assigned contract.[30] In these letters, Texaco informed Shore that it intended to drop certain leases within Maryland and Virginia, but that it intended to retain leases in Caroline, Essex, and King and Queen Counties, Virginia and Charles County, Maryland. With respect to the leases being retained, Texaco informed Shore that they would be assigned to and maintained by Eastern. With respect to the leases being dropped, the letters request that Shore consent to its forfeiture of the leases through the failure to pay applicable delay rentals.

There is no indication from the text of either letter that Shore was asked to or did in fact consent to Texaco's assignment of the leases to Eastern or to the release of Texaco from further obligations under the Texaco Agreement regarding the retained leases. However, Texaco argues that the existence of Shore President Stanley Sherrill's signature at the end of one of the letters indicates his consent to the entire content of the letter. However, as is evident by the language immediately preceding it,[31] Sherrill's signature merely indicated Shore's consent to the release of the specified leases. It was not an indication of his consent to release Texaco from its contractual obligations as to the retained leases. Because an obligor remains liable for performance of a contractual obligation even after an assignment,[32] and be-

cause the release of this obligation was never consented to by Shore, Texaco remained liable under the Texaco Agreement's gross negligence notice provision for all relevant leases.

Not surprisingly, Texaco maintains that even if it remained liable under the notice provision, its conduct did not amount to gross negligence or willful misconduct. In Virginia, gross negligence is defined as "the absence of slight diligence or the want of even scant care."[33] This is a question of law for the Court.[34] It is Texaco's burden on summary judgment to show what measures it took to ensure that Shore would receive notice in the event that Texaco or its subsequent assignees decided to not pay the delay rentals. As evidence of its diligence and exercise of scant care, Texaco offers the following actions. First, Texaco relies on the Bodine Letters sent to Shore on June 4, 1992 and July 30, 1992. In these letters, Texaco informed Shore that the leases in Caroline, Essex and King and Queen Counties were being assigned to and maintained by Eastern. Texaco makes much of the instruction to direct any "questions or correspondence regarding acreage" to Eastern and of Shore President Sherrill's signature on the July 30 letter. The Court, however, remains unpersuaded that the Bodine Letters in any way satisfied Texaco's notice obligation. While, the letters put Shore on notice that the leases were being assigned and to whom they were being assigned, neither letter addresses the issue of delay rental payments or whether or not they would be paid. The mere fact that Texaco assigned its interests in the leases to Eastern did not release Texaco from its obligation under the notice provisions.

Next, Texaco offers a letter written in January 1995 in which it informed Eastern that the Bureau of Land Management

---

30. *Cavalier Square Ltd. Partnership,* 435 S.E.2d at 395.

31. "EXECUTION HEREOF INDICATES CONSENT TO RELEASE ALL ACREAGE WITHIN THE TAYLORSVILLE BASIN EXCEPT AS TO LEASES LOCATED IN CAROLINE, ESSEX, AND KING AND QUEEN COUNTIES VIRGINIA AND CHARLES COUNTY, MARYLAND.
 /S/ STANLEY F. SHERRILL."

32. *Cavalier Square Ltd. Partnership,* 435 S.E.2d at 395; 6A C.J.S. Assignments § 97 (West 1975).

33. *Colby v. Boyden,* 241 Va. 125, 400 S.E.2d 184, 189 (1991); *Frazier v. City of Norfolk,* 234 Va. 388, 362 S.E.2d 688, 691 (1987).

34. *Rigney v. Neauman,* 203 Va. 822, 127 S.E.2d 403, 406 (1962).

("BLM") had held the Camp A.P. Hill leases in default for failure to pay delay rentals. The letter stated: "enclosed you will find a copy of a letter received from the BLM regarding the termination of the Camp A.P. Hill leases due to non-payment of the annual rental. Please handle has [sic] you deem necessary." Texaco maintains that its request of Eastern to "handle it" satisfied the gross negligence standard. The Court disagrees. Perhaps if Texaco had followed up on this letter to determine *how* Eastern had "handled it" or even if Texaco had simply carbon-copied the letter to Shore, it might have satisfied the gross negligence standard. But all Texaco did by writing this letter was effectively to pass the buck to Eastern, when it had no contractual right to do so in the absence of a release or novation.

Finally, Texaco directs the Court to a letter written in May 1995 in response to Shore's demand letter. This letter explained Texaco's position that it was not liable for Eastern's alleged breaches. It did not serve as notice to Shore that the delay rentals had not been paid, nor did it "offer" Shore the leases in time for them to be saved from forfeiture. Because at the time this letter was sent, the defaults were already apparent and much of the acreage already lost, this Court views this "CYA" letter as too little, too late.

In the absence of any substantial evidence showing what measures Texaco took to ensure that Eastern was aware of its notice obligation or to keep itself informed of Eastern's plans regarding the payment of delay rentals, this Court cannot conclude, as a matter of law, that Texaco exercised even scant care or slight diligence. It would have been a very simple matter for Texaco and Eastern to communicate on a monthly basis regarding the status of the delay rental payments. Instead, Texaco completely ignored its notice obligation and effectively washed its hands of the assigned leases when it clearly had a continuing duty to notify Shore of the failure to pay delay rentals. Even worse, when Texaco was informed by the BLM that the leases would be forfeited for nonpayment of delay rentals, it still took no action to ensure that Shore was notified of the situation. Because Texaco was grossly negligent in never notifying Shore that the leases would be forfeited, it is liable for the breach of the notice provision as a matter of law.

*Exxon Leases and the General Notice Provision*

■ Texaco also remained liable to Shore under the Exxon Leases' general notice provision. There being no exculpatory gross negligence clause in that agreement, Texaco can be held liable for simple negligence. As concluded above, Texaco's actions, or more appropriately "inactions," did not satisfy even a gross negligence standard. Therefore, as a matter of law, Texaco was negligent in not providing Shore with notice that the delay rentals had not been paid on the Exxon leases and thus breached its agreement with Shore to do so.

*Specific Performance*

■ In Virginia, the equitable remedy of specific performance may be considered "where the remedy at law is inadequate and the nature of the contract is such that specific enforcement of it will not result in great practical difficulties."[35] The decision of whether to grant such equitable relief is within the sound discretion of the trial court.[36] The Virginia Supreme Court instructs that when " 'there is nothing to indicate that [a contract's] enforcement would be inequitable to a defendant, but will* work injury and damage to the other party if it should be refused, in the absence of fraud, misapprehension, or mistake, relief will be granted by specific performance.' "[37] However, where it is impossible for a party to comply with a contractual condition, a court may not decree specific performance.[38] For

---

35. *Chattin v. Chattin*, 245 Va. 302, 427 S.E.2d 347, 350 (1993); *Thompson v. Commonwealth*, 197 Va. 208, 89 S.E.2d 64, 67 (1955).

36. *Chattin*, 427 S.E.2d at 350.

37. *Id. (quoting Haythe v. May*, 223 Va. 359, 288 S.E.2d 487, 488, (1982)).

38. *Shepherd v. Colton*, 237 Va. 537, 378 S.E.2d 828, 830 (1989) (where condition precedent to transfer of land was impossible, court would not

example, some courts have held that where the defendant no longer owns the land involved in the agreement, performance of the contract is impossible and the defendant may not be compelled to perform.[39]

 It is the plaintiff's burden at trial to show that specific performance of the contract would not be impracticable and that monetary damages would be inadequate.[40] The defendant can discharge its summary judgment burden by showing that the plaintiff failed to produce evidence to support its request for equitable relief.[41] The defendant is not required to produce any evidence to negate Shore's claim for specific performance. rather, Texaco need only demonstrate that the evidence which does exist does not "present a sufficient disagreement to require submission to a jury." [42] While Shore has introduced testimony to the effect that the leases at issue are "unique" properties, and thus monetary damages may be inadequate compensation, it has made absolutely no showing that the re-acquisition of the lost leasehold interests and conveyance to Shore would be practicable or even feasible Because Shore has failed to meet its burden as the party on whom the burden will rest at trial, summary judgment is granted in favor of Texaco on the issue of specific performance.

## IV. CONCLUSION

*The Eastern and Eastern A.P. Hill Leases*

Because there is no privity between the parties regarding the Eastern and the Eastern A.P. Hill leases, Texaco is not liable for the forfeiture of these leases. Summary judgment is therefore **GRANTED** in favor of Texaco. Accordingly, Shore's motion for summary judgment regarding the Eastern A.P. Hill Leases is **DENIED**.

order specific performance of the land sale contract).

39. *See, e.g., Nash v. Conatser*, 410 S.W.2d 512, 519 (Tex. Ct.App.-Dallas 1966, no writ).

40. *See Robertson v. Gilbert*, 219 Va. 620, 249 S.E.2d 787, 789 (1978); *Seaboard Ice Co. v. Lee*, 199 Va. 243, 99 S.E.2d 721, 727 (1957).

*Exxon Leases*

Shore's motion for summary judgment holding Texaco liable for the loss of the Exxon Leases (referred to by Shore as the "Model Leases") is **GRANTED**. Accordingly, Texaco's motion for summary judgment as to these leasehold interests is **DENIED**.

*Texaco and Texaco A.P. Hill Leases*

Shore's motion for summary judgment holding Texaco liable for the loss of the Texaco and Texaco A.P. Hill Leases is **GRANTED**. Accordingly Texaco's motion for summary judgment as to these leasehold interests is **DENIED**.

*Specific Performance*

Texaco's summary judgment motion on the issue of specific performance is **GRANTED**. Thus, the only issue which remains for trial is the amount of damages to be awarded for the loss of the Texaco and Exxon leases.

41. *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2553–54.

42. *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2511–12.